OPINION OF THE COURT
 

 SCIRICA, Chief Judge.
 

 TABLE OF CONTENTS
 

 OPINION OF THE COURT 199
 

 I.Overview. 200
 

 A. Combustion Engineering’s Asbestos-Induced Bankruptcy 201
 

 B. Issues Presented on Appeal. 202
 

 II.Background. 203
 

 A. Combustion Engineering. 203
 

 B. The Master Settlement Agreement. 204
 

 C. The Pre-Pack Plan. 205
 

 D. Plan Voting and Approval. 207
 

 E. The Bankruptcy Court Proceedings. 208
 

 F. District Court Proceedings and Plan Confirmation. 211
 

 G. The Consolidated Appeals. 213
 

 III.Standing. 214
 

 A. Background. 214
 

 B. Objecting Insurers and London Market Insurers. 215
 

 C. Insurers. 220
 

 D. Certain Cancer Claimants. 223
 

 IV. “Related to” Jurisdiction. 224
 

 A. Overview. 225
 

 B. Jurisdiction Over Independent Claims Against Non-Debtors 227
 

 
 *200
 
 1. Corporate Affiliation.227
 

 2. Financial Contributions.228
 

 3. Related Liability.230
 

 4. Shared Insurance .232
 

 V. Section 105(a) Equitable Injunction . DO CO CO
 

 A. The Requirements of Section 524(g)(4)(A) DO CO ^
 

 B. Section 105(a). CO CO C71
 

 YI. Two-Trust Structure. CO CO 00
 

 A. Discriminatory Treatment of Claims_ CO CO CO
 

 B. Creation of the “Stub Claims”. CO ^ CO
 

 VII. Going Concern Requirement: Section 524(g)(2)(b)(i)(II) 248
 

 VIII. Conclusion. 248
 

 This case involves twelve
 
 [1]
 
 consolidated appeals from the District Court’s order approving Combustion Engineering’s bankruptcy Plan of Reorganization under 11 U.S.C. § 1101
 
 et seq.
 

 [2]
 

 We will vacate and remand.
 

 I.Overview
 

 For decades, the state and federal judicial systems have struggled with an avalanche of asbestos lawsuits. For reasons well known to observers, a just and efficient resolution of these claims has often eluded our standard legal process — where an injured person with a legitimate claim (where liability and injury can be proven) obtains appropriate compensation without undue cost and undue delay.
 
 See
 
 Fed. R.Civ.P. 1 (goal “to secure the just, speedy and inexpensive determination of every action”). The difficulties with asbestos litigation have been well documented by RAND and others.
 
 [3]
 

 Efforts to resolve the asbestos problem through global settlement class actions under Fed.R.Civ.P. 23(b)(3) and 23(b)(1)(B) have so far been unsuccessful.
 
 See Am-chem Prods. v. Windsor,
 
 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (affirming denial of class certification of nationwide settlement class of asbestos claimants);
 
 Ortiz v. Fibreboard Corp.,
 
 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (reversing grant of class certification in
 
 *201
 
 limited fund class action under Fed. R.Civ.P. 23(b)(1)(B)). More than once, the Supreme Court has called on Congress to enact legislation creating a “national asbestos dispute-resolution scheme,” but Congress has yet to act.
 
 Amchem,
 
 521 U.S. at 598, 117 S.Ct. 2231;
 
 Ortiz,
 
 527 U.S. at 822, 119 S.Ct. 2295.
 

 For some time now, mounting asbestos liabilities have pushed otherwise viable companies into bankruptcy. The current appeal represents a major effort to extricate a debtor and two non-debtor affiliates from asbestos liability through a prepackaged Chapter 11 bankruptcy reorganization that includes 11 U.S.C. §§ 524(g) and 105(a) “channeling injunctions” and a post-confirmation trust fund for asbestos claimants. The Plan has been presented as a pre-packaged Chapter 11 reorganization plan, but it more closely resembles, in form and in substance, a liquidation of the debtor with a post-confirmation trust funded in part by non-debtors. Although prepackaged bankruptcy may yet provide debtors and claimants with a vehicle for the general resolution of asbestos liability, we find the Combustion Engineering Plan defective for the reasons set forth.
 

 A. Combustion Engineering’s Asbestos-Induced Bankruptcy
 

 Combustion Engineering defended asbestos-related litigation for nearly four decades until mounting personal injury liabilities eventually brought the company to the brink of insolvency. In the fall of 2002, Combustion Engineering and its parent company, Asea Brown Boveri, Inc. (“U.S.ABB”), attempted to resolve Combustion Engineering’s asbestos problems, as well as those of two U.S. AJBB affiliates, ABB Lummus Global, Inc. and Basic, Inc., through a pre-packaged Chapter 11 bankruptcy reorganization.
 
 [4]
 

 To this end, Combustion Engineering contributed half of its assets to a pre-petition trust (the “CE Settlement Trust”) to pay asbestos claimants with pending lawsuits for part, but not the entire amount, of their claims. The remaining, unpaid portion of these claims, known as “stub claims,” provided prepetition trust participants with creditor status under the Bankruptcy Code. Combustion Engineering then filed a prepackaged bankruptcy Plan of Reorganization under Chapter 11. The centerpiece of the Plan is an injunction in favor of Combustion Engineering that channels all of its asbestos claims to a post-confirmation trust (the “Asbestos PI Trust”) created under § 524(g) of the Bankruptcy Code. The Plan also extends this asbestos liability shield to the non-debtor affiliates Basic and Lummus. Millions of dollars in cash and other assets have been offered to the post-confirmation trust by Combustion Engineering, Basic and Lummus, as well as their respective parent companies, U.S. ABB and ABB Limited, to compensate asbestos claimants and to cleanse the companies of asbestos liability.
 

 After considerable negotiation, the Plan won approval from the majority of the asbestos claimants over the objections of several insurers and certain persons suf
 
 *202
 
 fering from asbestos-related injuries. The Bankruptcy Court recommended confirmation of the Plan, but made two significant modifications. First, it added a “super-preemptory” provision to protect the pre-petition rights of certain insurers. Second, it reconfigured the § 524(g) injunction in favor of Basic and Lummus as an equitable injunction under § 105(a).
 

 The District Court adopted the Bankruptcy Court’s findings of fact and conclusions of law and confirmed the Plan with two changes. The District Court modified the language of the “super-preemptory” provision and added a “neutrality” provision purporting to protect the debtor’s and insurers’ prepetition rights under certain insurance policies.
 

 B. Issues Presented on Appeal
 

 Although several difficult issues are presented on appeal, three are paramount. First, on the facts of this case, does the Bankruptcy Court have “related to” jurisdiction over the derivative and non-derivative claims against the non-debtors Basic and Lummus? Second, can a non-debtor that contributes assets to a post-confirmation trust take advantage of § 105 of the Bankruptcy Code to cleanse itself of non-derivative asbestos liability? Third, did the two-trust structure and use of “stub claims” in the voting process — which allowed certain asbestos claimants who were paid as much as 95% of their claims pre-petition to vote to confirm a Plan under which they appear to receive a larger recovery than other asbestos claimants — comply with the Bankruptcy Code? Also implicated are issues involving appellate standing and the propriety of the voting process.
 

 We summarize our holding. On the appellate standing issues, we conclude the Objecting Insurers and London Market Insurers have limited standing — that is, they only have standing to challenge the District Court’s modification of the super-preemptory provision. On that issue, we will vacate the District Court’s modification of the super-preemptory provision, and reinstate paragraph 17 of the Plan as initially drafted by the Bankruptcy Court. The Certain Cancer Claimants have standing to challenge Plan confirmation, including the propriety of the voting process, entry of the § 105(a) injunction in favor of Lummus (but not Basic), and issues relating to the validity of the two-trust structure.
 

 Based in part on the lack of factual findings in support of “related to” subject matter jurisdiction, we will vacate the § 105(a) injunction in favor of non-debtors Basic and Lummus. As the Plan’s proponents contend, and both the Bankruptcy Court and District Court found, extending the injunction to Basic and Lummus was essential to the Plan. As a practical matter, therefore, vacating the § 105(a) injunction defeats the proposed Plan of Reorganization. While we would normally remand for additional fact finding on the issue of subject matter jurisdiction, none is required here because the § 105(a) injunction must be rejected on substantive grounds as well. On the facts of this case, we hold the Bankruptcy Code precludes the use of § 105(a) to extend a channeling injunction to non-derivative third-party actions against a non-debtor.
 

 With regard to the two-trust structure, we believe the pre-petition payments to the CE Settlement Trust participants and the use of stub claims to secure confirmation votes may violate the Bankruptcy Code and the “equality among creditors” principle that underlies it, requiring a remand to the District Court for further development and review in considering any revised reorganization proposal.
 

 
 *203
 
 II. Background
 

 A. Combustion Engineering
 

 The story of Combustion Engineering sounds a familiar refrain in the asbestos world. From the 1930s through the 1960s, Combustion Engineering manufactured steam boilers containing asbestos insulation. The company was first named as a defendant in an asbestos-related lawsuit in the 1960s, and its asbestos liability increased steadily over the next thirty years. By the mid-1970s, Combustion Engineering was receiving a few hundred asbestos-related claims per year. That number grew to 19,000 annual cases by 1990, and jumped again to over 79,000 cases by 2002.
 

 Declining insurance reimbursements over the same period exacerbated the financial strain on the company. Prior to the mid-1990s, two-thirds of Combustion Engineering’s asbestos liability was covered by insurance. By 2002, some of the company’s insurers took the position that only one-third of Combustion Engineering’s asbestos liabilities were reimbursable. As a result, between 1990 and 2002 Combustion Engineering received only $517 million in insurance reimbursements for $950 million in asbestos-related liabilities. These factors left Combustion Engineering unable to meet its asbestos obligations without significant capital infusions from its parent corporation, U.S. ABB.
 
 [5]
 

 U.S. ABB acquired Combustion Engineering in 1990 in a leveraged buyout for $1.6 billion as part of a global acquisition of power technology companies by its parent company, ABB Limited, a diversified holding company of over 2,000 corporate entities based in Zurich, Switzerland. Between May 2000 and March 2002, U.S. ABB contributed $900 million in cash and other assets toward Combustion Engineering’s asbestos obligations. By late 2002, Combustion Engineering’s asbestos liability began to threaten ABB Limited’s financial viability as well. ABB Limited had borrowed heavily to finance an aggressive global expansion during the 1990s. As these acquisition costs came due, ABB Limited faced a $1.5 billion debt repayment obligation in December 2002, followed by another $2.1 billion repayment obligation in 2003. At the same time, ABB Limited experienced falling demand in its core businesses and a debt downgrade that reduced the conglomerate’s historical sources of liquidity. Significant debt obligations and Combustion Engineering’s rising asbestos liabilities threatened ABB Limited’s survival. With the conglomerate facing insolvency, ABB Limited’s lenders demanded immediate action and insisted that ABB take steps to resolve Combustion Engineering’s asbestos liabilities before extending additional credit. Some creditors threatened to institute an involuntary bankruptcy against U.S. ABB.
 
 [6]
 

 ABB Limited devised a divestment and restructuring program to resolve this financial crisis. ABB Limited’s lenders determined that certain businesses should be sold as part of the restructuring program, including Lummus and the rest of the oil, gas and petrochemical division of ABB, of
 
 *204
 
 which Lummus was part. ABB’s lenders purportedly determined these units could not be sold so long as Lummus carried asbestos liabilities.
 
 [7]
 
 Therefore, ABB attempted to cleanse Lummus of asbestos-related liabilities before putting the company up for sale. In October 2002, Combustion Engineering and ABB began to formulate a voluntary Chapter 11 prepackaged bankruptcy reorganization to cleanse not only Combustion Engineering, but also Basic and Lummus, of asbestos liability once and for all.
 

 Combustion Engineering and ABB Limited communicated with several key players in the world of asbestos litigation to facilitate the design and implementation of a pre-pack plan, including an attorney to serve as advisor on the interests of current claimants, and the general counsel of the Johns-Manville trust and president of the Claims Resolution Management Corporation (which manages claims processing for the Johns-Manville trust) to represent the interests of future claimants.
 
 [8]
 

 By late October 2002, the parties had negotiated the basic structure of a prepackaged plan of reorganization. Combustion Engineering would place half its assets into a pre-petition settlement trust (the “CE Settlement Trust”) to pay Combustion Engineering asbestos claimants who had claims in the legal system. Subsequently, Combustion Engineering, ABB Limited and several non-debtor subsidiaries of ABB Limited would contribute assets to a post-confirmation bankruptcy trust (the “Asbestos PI Trust”) created under § 524(g) of the Bankruptcy Code. The pre-pack plan would release certain parties from asbestos liability, including Combustion Engineering, Basic and Lum-mus, by channeling asbestos claims against those entities to the post-confirmation bankruptcy trust.
 

 B. The Master Settlement Agreement
 

 The parties funded and implemented the pre-petition CE Settlement Trust through a Master Settlement Agreement on November 22, 2002. To fund the trust, Combustion Engineering contributed $5 million in cash, a promissory note in the principal amount of approximately $100 million, and a $402 million loan agreement between U.S. ABB as borrower and Combustion Engineering as lender payable on demand. ABB Limited guaranteed both the note and the loan. These contributions comprised approximately half of Combustion Engineering’s total assets.
 

 The District Court found that participation in the CE Settlement Trust was offered to all pre-petition claimants with
 
 *205
 
 claims pending against Combustion Engineering as of November 14, 2002.
 
 [9]
 
 Participation was not expressly conditioned upon a vote in favor of the pre-pack Plan, although the Master Settlement Agreement provided that counsel for participating claimants would recommend, consistent with their ethical obligations, that each participating claimant accept the pre-pack Plan of Reorganization. Non-participating Combustion Engineering claimants were left to recover in the bankruptcy proceeding.
 

 The Master Settlement Agreement initially provided for three categories of distribution from the CE Settlement Trust to current Combustion Engineering asbestos personal injury claimants, depending upon the status of their respective claims. Category One included claimants who had reached a final enforceable settlement with Combustion Engineering to be paid prior to November 15, 2002. Given the advanced stage of their respective settlement agreements, the Plan’s proponents allegedly believed this group of claimants might force Combustion Engineering into involuntary bankruptcy if not paid immediately. Category One claimants were to receive 95% of their settled claim value. Category Two included claimants who also had satisfied all conditions and requirements for settlement with Combustion Engineering, but had settlement payments due after November 14, 2002 and prior to March 1, 2003. Category Two claimants were to receive 85% of their settled claim value. Category Three provided a catch-all category for all otherwise eligible Combustion Engineering personal injury claimants who did not satisfy the requirements of Categories One or Two. Category Three claimants were to receive an initial payment of 37.5% of their settled claim value upon submission of certain required information, followed by a second payment not to exceed an additional 37.5% (for a maximum recovery of 75%) taken pro-rata from the CE Settlement Trust after all Category One and Two claims had been paid at the applicable rates.
 

 Late in the pre-pack negotiations, 25,-000-30,000 additional claimants qualifying for payment under the Master Settlement Agreement appeared. These claimants were concentrated in jurisdictions with historically high asbestos claims payment averages. Once these additional Combustion Engineering claimants were factored in, it became clear the existing pre-petition trust assets were insufficient to pay participating claims under the original payment terms. ABB Limited, therefore, agreed to contribute an additional $30 million in cash to the CE Settlement Trust to pay these newly identified claimants — designated as Category Four claimants' — under the terms of a separate settlement agreement. The Category Four claimants agreed to accept less than 37.5% payment on then-liquidated claim value, and to subordinate their right to any second payment to the other settling claimants.
 

 In exchange for these payments, CE Settlement Trust participants agreed to forbear the prosecution of claims against Combustion Engineering outside of bankruptcy, but reserved the right to pursue the remainder of their claims in bankruptcy. These “stub claims” provided CE Settlement Trust participants with creditor status in bankruptcy, which allowed them to vote on the pre-pack Plan and share proportionally in the post-confirmation trust.
 

 C. The Pre-Pack Plan
 

 Concurrent with the CE Settlement Trust negotiations, the claimants’ repre
 
 *206
 
 sentatives undertook a due diligence review of Combustion Engineering and its affiliates. This included an assessment of ABB Limited’s financial condition and an examination of certain transactions between ABB entities and Combustion Engineering for evidence, among other things, of possible fraudulent transfers. In addition, the Combustion Engineering future claimants’ representative, Mr. Austern, retained several advisors to determine the value of available insurance assets, the financial condition of ABB Limited, and its ability to contribute to the Asbestos PI Trust. Following this review, Mr. Austern insisted that ABB Limited augment its financial contributions to the Plan.
 
 [10]
 
 The Official Committee of Unsecured Creditors likewise demanded several modifications to the trust distribution procedures. The parties settled on the final terms in January 2003.
 

 The centerpiece of the pre-pack Plan involved an injunction in favor of debtor Combustion Engineering and non-debtors Basic and Lummus, channeling all asbestos-related claims against those companies to a single asbestos trust (the “Asbestos PI Trust”) created under 11 U.S.C. § 524(g) and prohibiting claims other than against the Asbestos PI Trust (the “channeling injunction”). The parties agreed the post-confirmation trust would be funded by contributions from Combustion Engineering, ABB Limited, U.S. ABB, Lum-mus and Basic. The Bankruptcy Court found that under the Plan Combustion Engineering would contribute its rights to proceeds under certain insurance policies and settlement agreements with a face amount exceeding $320 million.
 
 [11]
 
 It would
 
 *207
 
 also contribute $51 million in cash, future excess cash flows and a $20 million secured note convertible into 80% of the equity of the restructured entity. ABB Limited would contribute 30,298,913 shares of its common stock (with an estimated value of $82 million), $250 million in cash from 2004 to 2006, and an additional $100 million between 2006 and 2011, contingent in part on its future financial performance. This commitment was guaranteed by various ABB Limited affiliates. ABB Limited also agreed to release all claims and interests in insurance policies covering Combustion Engineering’s asbestos personal injury claims. U.S. ABB agreed to indemnify all of Combustion Engineering’s environmental liabilities (estimated at the time at more than $100 million), to release its indemnification rights against Combustion Engineering for asbestos claims asserted after June 30, 1999, and to contribute a $5 million Limited Carrier Indemnity. Contingent upon the sale of Lummus within eighteen months of the effective date of the Plan, U.S. ABB would make additional payments of $5 million to the Asbestos PI Trust and $5 million to the pre-petition CE Settlement Trust. In addition, U.S. ABB agreed to contribute almost $38 million, deposited into a segregated account, to pay asbestos claims attributed solely to Basic and Lummus. Basic and Lummus agreed to release and assign to the Asbestos PI Trust all of their rights to proceeds under insurance policies covering asbestos personal injury claims.
 

 Distributions from the Asbestos PI Trust were governed by trust distribution procedures similar to those historically used by the Connecticut Valley Claims Service Company (“CVCSC”) in servicing Combustion Engineering’s asbestos claims.
 
 [12]
 
 Combustion Engineering and the Asbestos PI Trust were given the exclusive right to determine whether to allow asbestos claims under the trust distribution procedures.
 
 [13]
 
 Under the pre-pack Plan, participating insurers were therefore excluded from the Asbestos PI Trust’s claims determination process.
 

 D. Plan Voting and Approval
 

 Solicitation for the pre-pack Plan began on or around January 22, 2003, when documents including a Disclosure Statement, the proposed Plan of Reorganization, a ballot, and letters from the current creditors’ representative and futures’ representative were sent to approximately 350 asbestos plaintiffs’ counsel. These solicitations, seeking approval of the Plan, were extended to any firms representing plaintiffs with claims against Combustion Engineering, Basic or Lummus. The packages included both master and individual ballots. Master ballots for multiple claim holders required the agent casting the ballot to include a valid power of attorney, proxy, or other written evidence
 
 *208
 
 of agency for every Asbestos PI Trust claim holder identified on the ballot. CVCSC, Combustion Engineering’s claims processing organization, or Trumbull Associates, Combustion Engineering’s balloting agent, would communicate with any law firm that submitted a master ballot without a valid power of attorney.
 

 Approximately 232,000 ballots were cast by the February 19, 2003 voting deadline, with 186,000 votes in favor of the Plan and 46,000 votes against. More than 107,908 of these ballots were not counted or were invalidated by Combustion Engineering’s balloting agent because they were not accompanied by a valid power of attorney. An additional 8,432 ballots were invalidated for other reasons. Of the resulting 115,787 valid ballots, 111,986 Combustion Engineering claimants voted in favor of the Plan (approximately 97% of total remaining claimants) while 3,594 voted against.
 
 [14]
 
 Of the 8,017 pending Lummus personal injury claims, 1,846 voted in favor of the Plan, and two voted against. Of the 3,715 pending Basic personal injury claims, 206 Basic claimants voted in favor of the Plan, and fourteen voted against. An estimated 99,000 of the tabulated votes appear to have been “stub claim” votes cast by CE Settlement Trust participants.
 

 E. The Bankruptcy Court Proceedings
 

 On February 17, 2003, Combustion Engineering filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code, along with a proposed Disclosure Statement and Plan of Reorganization, in the United States Bankruptcy Court for the District of Delaware. On March 31, 2003, this Court issued an order designating Judge Alfred M. Wolin as the district court judge and providing that the parties “will have an opportunity to be heard as to which aspects of the matter Judge Wolin will hear in the District Court and which matters will remain with ... the Bankruptcy Court.”
 

 On May 9, 2003, Judge Wolin entered an order referring the case to the Bankruptcy Court. The order designated all matters to be adjudicated as part of Plan confirmation, including matters arising under 11 U.S.C. §§ 524(g) and 502(c), as non-core matters subject to de novo review and final order by the District Court.
 

 The Bankruptcy Court conducted hearings on the Disclosure Statement and the Plan between April and June of 2003. Various parties objected to the Disclosure Statement, the Plan and the pre-pack solicitation procedures. Certain insurance companies argued that Plan provisions assigning policy proceeds to the Asbestos PI Trust violated existing policies and/or settlement agreements with Combustion Engineering. Other insurers who had negotiated pre-petition settlements with Combustion Engineering (the “Indemnified Insurers”) objected to the Plan on the ground that it impermissibly channeled indemnities under the settlements to the post-confirmation trust without providing sufficient funding to pay those indemnities. As a result, the Indemnified Insurers argued they were entitled to vote on Plan confirmation. The Certain Cancer Claimants argued the Plan impaired their substantive rights to recover
 
 *209
 
 through the tort system.
 
 [15]
 
 The Bankruptcy Court allowed discovery on these objections, which resulted in several modifications to the proposed Plan and Disclosure Statement.
 

 On June 23, 2003, the Bankruptcy Court entered findings of fact and conclusions of law regarding core matters, and proposed findings of fact and conclusions of law as to non-core matters.
 
 In re Combustion Eng’g,
 
 295 B.R. 459 (Bankr.D.Del.2003). The Bankruptcy Court overruled all objections raised by the insurers and Certain Cancer Claimants as to core matters, and recommended the District Court overrule all remaining objections as to non-core matters.
 
 Id.
 
 at 462. The Bankruptcy Court found the trust distribution procedures provided the same protocol as the CVCSC previously used to adjudicate and pay asbestos claims, and therefore did “not change whatever rights the insurers had pre-petition regarding the payment of claims.”
 
 Id.
 
 at 473. “Although the [trust distribution procedures] do not provide for insurers to have a say in what claims are paid ... the insurers did not have such input pre-petition.”
 
 Id.
 
 But recognizing the Plan should not modify the contractual rights of insurers, the court added a provision to make clear the Plan did not alter the contractual rights of insurers under any insurance policy or settlement agreement. The super-preemptory provision provided:
 

 [Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers’ legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.
 

 Id.
 
 at 494. The Bankruptcy Court explained, “the Plan has been modified to make clear that
 
 nothing
 
 impairs [the insurers’] rights.”
 
 Id.
 
 at 474 (emphasis in original). As a result, the Bankruptcy Court concluded the Objecting Insurers did not have a right to vote on Plan confirmation because the Plan expressly stated that “the rights of insurers shall be determined under the subject insurance policies or subject insurance agreements as applicable and nothing in the Plan is to affect that.”
 
 Id.
 
 The court also found there was “no litigation pending that would implicate the indemnities.”
 
 Id.
 
 at 475.
 

 The Bankruptcy Court further determined the Plan satisfied the confirmation requirements set forth in §§ 1129(a) and 524(g) of the Bankruptcy Code. The Bankruptcy Court noted that, as a practical matter, the Plan offered the only feasible mechanism for ensuring Combustion Engineering’s creditors would receive any recovery. Moreover, the court found the purpose of negotiating the Master Settlement Agreement and CE Settlement Trust was to “buy immediate peace from thousands of asbestos lawsuits (pending and potential) against Combustion Engineering
 
 *210
 
 so that Combustion Engineering could file a prepackaged bankruptcy plan rather than face a freefall bankruptcy.”
 
 Id.
 
 at 466. Contrary to the objections of the Certain Cancer Claimants, the Bankruptcy Court found that “[p]articipation in the [Master Settlement Agreement] was offered to all pre-petition claimants,” and participation “was not conditioned upon a favorable vote on the proposed plan.”
 
 Id.
 
 at 468.
 

 With respect to the Asbestos PI Trust, the Bankruptcy Court concluded § 524(g)(4)(A)(ii) of the Code did not permit the inclusion of independent claims against non-debtors Basic and Lummus in the channeling injunction. But the Bankruptcy Court granted precisely the same relief — that is, channeling asbestos-related claims against Basic and Lummus to the Asbestos PI Trust — under § 105(a). Analyzing the factors announced in
 
 In re Dow Corning Corp.,
 
 280 F.3d 648, 658 (6th Cir.2002)
 
 (“Doiv Coming
 
 II”), the Bankruptcy Court determined it was appropriate to enjoin the independent, non-derivative claims against Basic and Lummus under § 105(a).
 

 In
 
 Dow Coming II,
 
 the Court of Appeals for the Sixth Circuit held that a bankruptcy court may permanently enjoin third-party claims against a non-debtor if seven factors are met:
 

 (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
 

 (2) the nondebtor has contributed substantial assets to the reorganization;
 

 (3) the injunction is essential to the reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
 

 (4) the impacted class, or classes, has overwhelmingly voted to accept the plan;
 

 (5) the plan provides a mechanism to pay all, or substantially all, of the class or classes affected by the injunction;
 

 (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full[;] and ...
 

 (7) the bankruptcy court made a record of specific factual findings that support its conclusions.
 

 In re Combustion Eng’g,
 
 295 B.R. at 483 (citing
 
 Dow Coming II,
 
 280 F.3d at 658).
 

 The Bankruptcy Court concluded the injunction satisfied
 
 Dow Coming II
 
 factors one, two, three, six and seven. On the first factor, the court found Combustion Engineering shared an “identity of interest” with non-debtors Basic and Lummus because “ABB’s need to sell Lummus ... instigated ABB’s willingness to contribute to Combustion Engineering’s plan funding.”
 
 Id.
 
 at 484. On factor two, the court found that Basic and Lummus contributed to the Asbestos PI Trust their rights to certain shared insurance policies. The court determined the injunction satisfied factor three because it allowed ABB to restructure its debt and contribute substantial assets to the post-confirmation trust. The court found the injunction satisfied factor six because the $38 million in assets segregated to pay Basic’s and Lum-mus’ asbestos liabilities was “sufficient to provide the opportunity to pay any non-accepting creditor.”
 
 Id.
 

 But the Bankruptcy Court initially held the Plan did not satisfy
 
 Dow Coming II
 
 factors four and five. The court concluded it was unclear from the record “what, if any, effort was made to identify, notify and solicit votes from creditors with claims only against Lummus and only against Basic; i.e., not shared with Combustion Engi
 
 *211
 
 neering.”
 
 Id.
 
 Likewise, the court did not believe the Plan provided the requisite funding and distribution processes to pay the direct creditors of Lummus and Basic. Therefore, despite its approval of the Disclosure Statement and Plan, as modified through June 4, 2003, the Bankruptcy Court recommended the District Court withhold confirmation for ten days to allow the Plan’s proponents to provide additional information concerning the Basic and Lummus claimants. Specifically, the Bankruptcy Court ordered the Plan proponents to submit supplemental documentation showing that Basic and Lummus creditors were provided sufficient notification of the injunction, as well as establishing the process by which these creditors would be paid and identifying the source of funds.
 

 On July 10, 2003, the Bankruptcy Court entered a Supplemental and Amendatory Order Making Additional Findings and Recommending Confirmation of the Plan of Reorganization. In its supplemental order, the Bankruptcy Court found,
 
 inter alia:
 
 the notice given to Lummus and Basic creditors comported with due process “under the unique circumstances of the case”; Basic claimants would receive more than they would receive without the Plan and Lummus claimants would receive at least as much as they would receive without the Plan; and the trust distribution procedures establish a sufficient method of paying Basic and Lummus claimants.
 

 F. District Court Proceedings and Plan Confirmation
 

 In reviewing the Bankruptcy Court’s proposed Findings of Fact and Conclusions of Law, the District Court acknowledged the proposed Plan of Reorganization was not without defect: “Today we consider for confirmation a pre-packaged bankruptcy plan. The plan is not perfect, but then we operate in an imperfect system and will substitute fairness and the greatest good for the greatest number for perfection.” The District Court recognized the Plan was “fragile,” and had to be confirmed “promptly to preserve ABB’s economic viability.” The District Court further explained that “[w]ere ABB to become insolvent, the possibility that Combustion Engineering could emerge as a reorganized debtor would be remote,” as would the “prospect of a viable trust to pay persons suffering from exposure to Combustion Engineering’s asbestos.”
 

 In an unpublished oral opinion, the District Court rejected or overruled objections to Plan confirmation. The District Court concluded the insurers lacked standing to object to Plan confirmation because their pecuniary interests were not “directly and adversely affected” by the order of the Bankruptcy Court. The court explained the super-preeemptory provision added by the Bankruptcy Court made clear the insurers’ pre-petition rights would not be altered by the Plan:
 

 [T]he plan specifically provides that payment of claims is subject to the rights of insurers under their policies or other agreements. Should the insurers claim that this provision [i.e., the super-preemptory provision] has been violated in the course of the administration of the personal injury trust, that will be the time to determine the rights of insurers in an appropriate proceeding.
 

 Nonetheless, on the motion of the Future Claimants Representative and the Official Committee of Unsecured Creditors, the District Court modified the super-preemptory provision to state:
 

 Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision
 
 *212
 
 that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing the insurers’ legal, equitable or contractual rights, if any,
 
 in respect of any claims (as defined in Section 101(5) of the Bankruptcy Code).
 
 The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements, as applicable,
 
 and under applicable law.
 

 (emphasis added to indicate changes). In addition, the District Court supplemented the super-preemptory provision with the following “neutrality provision”:
 

 Nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Insurance Settlement Agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the Subject Insurance Policies and the Subject Insurance Settlement Agreements, including, but not limited to, any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.
 

 The District Court provided no rationale for these modifications.
 

 Proceeding to the substantive objections, the District Court found the pre-petition trust payments did not induce CE Settlement Trust participants to vote in favor of the Plan, and rejected the argument that the pre-petition payments and creation of the stub claims were intended to manufacture a confirming vote. Instead, the District Court concluded that Combustion Engineering created the stub claims because it had “insufficient funds to pay the settlement trust claimants 100 percent of their claims,” and that the purpose of such payments was to provide Combustion Engineering “a little time, a breathing space, while the pre-packaged plan was negotiated.” Moreover, the court found the votes of the stub claims were not invalid as a result of a Master Settlement Agreement provision prohibiting CE Settlement Trust participants from pursuing their stub claims outside of bankruptcy.
 

 The District Court found the Plan satisfied all requirements of 11 U.S.C. § 1129. Specifically, the District Court found the Plan provided between two and three times more assets than would a Chapter 7 liquidation, satisfying the § 1129(a)(7) “best interests of the creditors” test. In so holding, the District Court rejected the argument that the pre-petition transfer of assets to the CE Settlement Trust constituted a voidable preference under § 547 of the Bankruptcy Code, reasoning that this argument was “simply a restatement of the argument already dispensed with by comparing the liquidation value of the company with the value paid to claimants under the plan.” The District Court also found the Plan had been proposed in good faith under § 1129(a)(3).
 

 The District Court rejected all challenges to the § 524(g) channeling injunction. The District Court found the contention that the Plan violated § 524(g) by treating present and future claimants differently was not supported by the record. Specifically, it found that all present claimants were free to participate in the Plan, and that the Asbestos PI Trust (from which future claimants would be paid) and the CE Settlement Trust employed substantially the same claims handling proce
 
 *213
 
 dures. The court recognized that pre-petition settlement participants might receive more for their claims than non-participants, but reasoned this did not violate § 524(g) because these persons “simply were not similarly situated.” The District Court also found the reorganized Combustion Engineering satisfied the “going concern” requirement of § 524(g) because it would own and operate a real estate business after emerging from bankruptcy. The court rejected the argument that § 524(g)(2)(B)(i)(II) required Combustion Engineering to pay dividends, instead concluding § 524(g) merely required any dividends the company in fact paid be included in future payments to the Asbestos PI Trust. The court found the fact that the Bankruptcy Court did not estimate the total value of all asbestos claims did not defeat Plan confirmation, noting the Plan did not prevent estimation of claims in the future, if feasible.
 

 The District Court concluded the Bankruptcy Court correctly analyzed the application of § 105(a) under
 
 Dow Coming II
 
 and properly extended the channeling injunction to non-debtors Basic and Lum-mus. In support of this conclusion, the District Court found the non-debtors’ asbestos liability was, in many cases, derivative of Combustion Engineering’s asbestos liability, and the channeling injunction was integral to the Plan.
 

 On the issue of jurisdiction over claimants with independent claims against the non-debtors, the District Court found the analysis of the § 105(a) injunction and the “related to” jurisdiction inquiry “substantially overlap.” The court described a “unity of interest” between Combustion Engineering and the non-debtors that provided a basis for exercising “related to” jurisdiction over the independent claims against the non-debtors:
 

 Here we have corporate affiliates, shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue. The premises on which the plan is based establish the extensive financial interdependence between the entities.
 

 Having dismissed all appeals and overruled all objections to the Plan, the District Court affirmed and adopted the Bankruptcy Court’s proposed findings of fact and conclusions of law, and confirmed Combustion Engineering’s Plan of Reorganization.
 

 G. The Consolidated Appeals
 

 Primary and excess insurers
 
 [16]
 
 of Combustion Engineering, Lummus and Basic filed thirteen separate appeals challenging aspects of the District Court’s confirmation order.
 
 [17]
 
 The Certain Cancer Claimants filed a separate appeal.
 
 [18]
 
 Appellant First State Insurance Company
 
 *214
 
 filed emergency motions with this Court seeking a stay to prevent the possibility that the appeal would become equitably moot if the Plan of Reorganization were allowed to proceed. The parties entered a stipulated “standstill agreement” to halt implementation of the Plan pending appeal before we could rule on those motions. We accepted the parties’ stipulation by order dated August 19, 2003. We consolidated the appeals and heard oral argument.
 
 [19]
 

 III. Standing
 

 A. Background
 

 As a threshold matter, we must determine whether appellants have standing to challenge confirmation of the Plan of Reorganization.
 
 Bender v. Williamsport Area Sch. Dist.,
 
 475 U.S. 534, 546 n. 8, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (“The rules of standing, whether as aspects of the Art. Ill case-or-controversy requirement or as reflections of the prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention.”) (citations omitted). Standing to appeal in a bankruptcy case is limited to “persons aggrieved” by an order of the bankruptcy court.
 
 Gen’l Motors Acceptance Corp. v. Dykes (In re Dykes),
 
 10 F.3d 184, 187 (3d Cir.1993). Originally set forth in the Bankruptcy Act of 1898,
 
 [20]
 
 the “persons aggrieved” test now exists as a prudential standing requirement that limits bankruptcy appeals to persons “whose rights or interests are ‘directly 'and adversely affected pecuniarily’ by an order or decree of the bankruptcy court.”
 
 [21]
 

 In re Dykes,
 
 10 F.3d at 187 (citing
 
 In re Fondiller,
 
 707 F.2d 441, 443 (9th Cir.1983)). “[P]erson[s] aggrieved” must show the order of the bankruptcy court “diminishes their property, increases their burdens, or impairs their rights.”
 
 In re PWS Holding Corp.,
 
 228 F.3d at 249 (citing
 
 In re Dykes,
 
 10 F.3d at 187). Whether someone is a person aggrieved is normally a question of fact.
 
 In re Dykes,
 
 10 F.3d at 188.
 

 
 *215
 
 Appellate standing in the bankruptcy context is more restrictive than Article III standing, which “need not be financial and need only be ‘fairly traceable’ to the alleged illegal action.”
 
 Travelers,
 
 45 F.3d at 741 (citation omitted). This more stringent appellate standing requirement rests on the “particularly acute” need to limit appeals in bankruptcy proceedings, which often involve a “myriad of parties ... indirectly affected by every bankruptcy court order[.]”
 
 Id.
 
 (citing
 
 Kane v. Johns-Manville Corp.,
 
 843 F.2d 636, 642 (2d Cir.1988));
 
 see also In re DuPage Boiler Works, Inc.,
 
 965 F.2d 296, 297 (7th Cir.1992) (“The ‘person aggrieved’ test insures that bankruptcy proceedings are not unreasonably delayed by protracted litigation by allowing only those persons whose interests are directly affected by a bankruptcy court order to appeal.”);
 
 In re Fondiller,
 
 707 F.2d at 443 (“Efficient judicial administration requires that appellate review [in bankruptcy proceedings] be limited to those persons whose interests are directly affected.”). As such, we have denied standing to parties involved in bankruptcy proceedings “who, even though they may be exposed to some potential harm incident to the bankruptcy court’s order, are not ‘directly affected’ by that order.”
 
 Travelers,
 
 45 F.3d at 741. Standing is not dispensed in gross, but rather is determined by the specific claims presented.
 
 See Lewis v. Casey,
 
 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996);
 
 Int’l Primate Prot. League v. Adm’r of Tulane Educ. Fund,
 
 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).
 

 There are four groups of appellants in this case whose claims must be examined for purposes of appellate standing. The first group consists of the Objecting Insurers — those providing primary and excess insurance coverage to Combustion Engineering.
 
 [22]
 
 The second group consists of the London Market Insurers — the insurers providing primary and excess insurance coverage for non-debtors Basic and Lum-mus.
 
 [23]
 
 The third group is the Indemnified Insurers — insurance companies that entered pre-petition settlement agreements with Combustion Engineering to resolve contested coverage issues. Finally, the Certain Cancer Claimants consist of 291 individuals (or, if deceased, their legal representatives) who suffer from asbestos-related injuries.
 

 B. Objecting Insurers and London Market Insurers
 

 The Objecting Insurers and the London Market Insurers raise several
 
 *216
 
 challenges to Plan confirmation on appeal. Our task in assessing the appellate standing of the Objecting Insurers and the London Market Insurers is informed by the “super-preemptory” and “neutrality” provisions of the Plan.
 

 The Bankruptcy Court added the “super-preemptory” provision to the Plan in response to arguments by certain insurers that they were impermissibly excluded from the confirmation vote.
 
 [24]
 
 As originally drafted, the “super-preemptory” provision provided that nothing in the Plan would impair the insurers’ pre-petition rights under subject insurance policies and settlements. As such, in addressing the insurers’ voting argument, the Bankruptcy Court emphasized the Plan had been “modified to make clear that
 
 nothing
 
 impairs their rights.”
 
 In re Combustion Eng’g, 295
 
 B.R. at 474 (emphasis in original). The Bankruptcy Court found the assignment of insurance proceeds to the Asbestos PI Trust did not impair the rights of insurers because the “rights of insurers shall be determined under the subject insurance policies or subject insurance settlement agreements as applicable and nothing in the Plan is to affect that.”
 
 Id.
 

 The District Court similarly concluded the insurers lacked standing to appeal or object to Plan confirmation because their “pecuniary interests [were] not ‘directly or adversely affected’ ” by the Plan. The District Court reasoned the Plan did not modify insurers’ rights by excluding them from the determination of asbestos claims because “the plan specifically provides that payment of claims is subject to the rights of the insurers under their policies or other agreements.” However, on the motions of the Official Committee of Unsecured Creditors and Future Claimants’ Representatives, the District Court then modified the super-preemptory provision to refer to the rights of insurers, “if any, in respect of any claims (as defined by section 101(5) of the Bankruptcy Code).”
 
 [25]
 
 The District Court also added the “neutrality” provision to provide reciprocal protections for the debtor’s pre-petition rights under the subject insurance policies.
 
 [26]
 

 
 *217
 
 Among other things, the Objecting Insurers and London Market Insurers contend the District Court’s modifications to the Plan altered their pre-petition contractual rights, thus providing them with appellate standing as “parties in interest” within the meaning of §§ 1128(b) and 1109(b) of the Bankruptcy Code. As discussed, however, we apply a “persons aggrieved” standard, not a “party in interest” standard, to determine bankruptcy appellate standing.
 
 See In re Dykes,
 
 10 F.3d at 187. Therefore, the Objecting Insurers and London Market Insurers have standing to challenge a provision of the Plan only if that provision “diminishes their property, increases their burdens, or impairs their rights.”
 
 In re PWS Holding Corp.,
 
 228 F.3d at 249 (quoting
 
 In re Dykes,
 
 10 F.3d at 187). Applying the “persons aggrieved” standard, we conclude the Objecting Insurers and London Market Insurers have limited appellate standing to challenge only the modification of the super-preemptory provision but not the neutrality provision.
 

 The super-preemptory provision drafted by the Bankruptcy Court provides that nothing in the Plan “shall in anyway [sic] operate to, or have the effect of, impairing insurers’ legal, equitable or contractual rights, if any, in any respect.” As both the Bankruptcy Court and District Court recognized, this language broadly preserves insurers’ pre-petition rights under the subject insurance policies and settlements. The insurers are not obligated to pay amounts exceeding their pre-existing policy limits. So long as claims are paid in a manner consistent with the rights and conditions set forth in the subject policies, the Objecting Insurers and London Market Insurers are not “aggrieved” for purposes of bankruptcy appellate standing. The trust distribution procedures do not permit insurers to participate in the payment of claims (the Asbestos PI Trust trustee and claims reviewers evaluate them). But, as the Bankruptcy Court found, the insurers did not have this right pre-petition.
 
 In re Combustion Eng’g,
 
 295 B.R. at 473 (“[T]he plan does not change whatever rights the insurers had prepetition regarding payment of claims.”). Moreover, even though insurers are excluded from claims processing (as they were pre-petition), they may still dispute coverage under specific policies, and may raise any of the same challenges or defenses to the payment of claims available pre-petition. For these reasons, we conclude the Plan as originally drafted does not diminish the rights of insurers or increase their burdens under the subject insurance policies and settlements.
 

 The District Court modified the super-preemptory provision to apply more narrowly to “the insurers’ legal, equitable or contractual rights, if any,
 
 in respect of any claims
 
 (as defined by section 101(5) of the Bankruptcy Code)” (emphasis added). The Official Committee of Unsecured Creditors argues the super-preemptory provision was initially included in the Plan to make clear the “claims” of insurers were unimpaired by the Plan, and thus not entitled to vote on the Plan’s confirmation. According to the Official Committee, by referring to “rights” instead of “claims,” the language in the Bankruptcy Court’s order was “broader than the protection meant to be afforded under section 1124.” The Official Committee contends the District Court’s modification was necessary to
 
 *218
 
 track the applicable language in § 1124(1) referring to “claims,” and not “rights.”
 

 The Official Committee of Unsecured Creditors concedes too much by noting the District Court’s modification narrowed the protections originally afforded to insurers under the Plan. We agree the District Court’s version more closely tracks the “impairment” language of § 1124(1), and in that sense more explicitly addresses the insurers’ voting argument. But for purposes of standing, the question is not whether the Plan impaired the claims of insurers, but whether it “diminishes their property, increases their burdens, or impairs their rights.”
 
 In re PWS Holding Corp.,
 
 228 F.3d at 249 (quoting
 
 In re Dykes,
 
 10 F.3d at 187). As originally drafted, the super-preemptory provision made clear that any pre-petition contractual rights remained unaltered and that insurer claims were therefore unimpaired for voting purposes. But by limiting the scope of the super-preemptory provision only to “claims” and not to broader “rights,” the District Court exposed the Objecting Insurers and London Market Insurers to the possibility that other Plan provisions could affect aspects of subject policies and settlement agreements. As such, we conclude the Objecting Insurers and London Market Insurers have standing to challenge this modification. Although the District Court found that “all substantive rights of the insurers were expressly preserved under the Plan per the order of’ the Bankruptcy Court, it nevertheless altered the language of the provision in a manner the insurers claim was adverse to their rights. We agree with the insurers on this point. To resolve this matter, we note that at oral argument Combustion Engineering stated it would be amenable to reinstating the super-preemptory provision as drafted by the Bankruptcy Court. In this context, we will vacate the District Court’s modification, restoring the provision as drafted by the Bankruptcy Court.
 

 In contrast to the super-preemptory provision, the neutrality provision added by the District Court protects the prepetition rights and obligations of both the debtor and the insurers under the Plan by preserving for “any Entity ... any and all claims, defenses, rights or causes of action” under subject insurance policies and settlement agreements. Unlike the modifications to the super-preemptory provision, which provided limited protection to “claims,” the neutrality provision applies broadly to all “claims, defenses, rights or causes of action.” Therefore, the practical effect of the neutrality provision is to extend the protections afforded to insurers under the super-preemptory to include debtor Combustion Engineering. Affirming the pre-petition contractual obligations of the Objecting Insurers and London Market Insurers does not impair their rights or increase their burdens under the subject insurance policies. We conclude, therefore, the Objecting Insurers and London Market Insurers have no appellate standing to challenge the addition of the neutrality provision.
 

 The London Market Insurers also contend the Plan impairs their rights under the anti-assignment provisions of the relevant insurance policies. With respect to the anti-assignment provisions, we agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering’s insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate.
 
 [27]
 
 This
 
 *219
 
 is not the case, however, with respect to anti-assignment provisions in the Basic and Lummus primary and excess insurance policies issued by the London Market Insurers and North River Insurance. Section 541(c)(1) of the Bankruptcy Code provides, in part:
 

 Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law — (A) that restricts or conditions transfer of
 
 such interest by the debtor.
 

 11 U.S.C. § 541(c)(1) (emphasis added). Put simply, § 541 prohibits restrictions on the interests of the debtor, which includes the insurance policies held by Combustion Engineering. It does not, however, place similar restrictions on the interests of non-debtors.
 
 See
 
 11 U.S.C. § 541(l)(a) (“The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of ... all legal or equitable interests of the debtor in property as of the commencement of the case.”);
 
 see also
 
 Legislative Statement
 
 to
 
 11 U.S.C. § 541(l)(a) (“As section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate.”). To the extent the subject insurance policies are jointly held by Combustion Engineering and a non-debtor, in this case Basic or Lummus, the § 541 preemption of anti-assignment provisions applies only to Combustion Engineering’s interest in the shared policies. Accordingly, the London Market Insurers have appellate standing to challenge any assignment of policy proceeds that violated anti-assignment provisions in the excess and primary policies held by non-debtors Basic and Lummus. That said, however, we are unable to consider the merits of this issue because neither the Bankruptcy Court nor the District Court made any findings of fact regarding the terms or operation of anti-assignment provisions in the Basic and Lummus policies. We would ordinarily remand for additional fact finding on this issue, but, as we discuss, that will be unnecessary because we vacate Plan confirmation on other grounds.
 

 In sum, the Objecting Insurers and London Market Insurers have limited appellate standing to challenge the operation of the super-preemptory provision as modified by the District Court. The London Market Insurers also have standing to challenge those aspects of the Bankruptcy Court’s order that purport to violate anti-assignment provisions in the primary and
 
 *220
 
 excess insurance policies of Basic and Lummus. The remaining issues raised by the Objecting Insurers and London Market Insurers do not directly and pecuniarily affect their rights under the insurance policies and settlements.
 
 [28]
 
 Therefore we will dismiss the remaining challenges to Plan confirmation raised by the Objecting Insurers and London Market Insurers for lack of appellate standing.
 

 C. Indemnified Insurers
 

 The Indemnified Insurers include certain insurance companies that entered into pre-petition settlement agreements with Combustion Engineering.
 
 [29]
 
 These settlement agreements provided for payment to Combustion Engineering in exchange for the full release of insurance policies and all claims under such policies (including asbestos claims), and required Combustion Engineering to indemnify the settling insurers for related litigation costs and liabilities.
 
 [30]
 
 Prior to the commencement of the Combustion Engineering bankruptcy proceedings, the Indemnified Insurers had been named in certain class-action suits brought under state unfair claims handling statutes in West Virginia and Massachusetts.
 
 [31]
 
 In those cases, a class of asbestos claimants who had settled claims against Combustion Engineering asserted the Indemnified Insurers were responsible for the deficiency between the settlement paid by Combustion Engineering and the amount they allegedly should have recovered. Indemnified Insurers Century Indemnity Company and One Beacon America Insurance Company, fik/a Commercial Union Insurance, each sought indemnification by Combustion Engineering for expenses incurred in defending those suits, including any resulting liability.
 

 The Indemnified Insurers objected to the Plan of Reorganization, arguing they were impermissibly excluded from the confirmation vote. Following these objections, Combustion Engineering modified the Plan to classify the indemnity claims as either Class Three workers compensation claims, Class Four general unsecured claims, or administrative claims — all of which were considered unimpaired claims. Because unimpaired claims are not entitled
 
 *221
 
 to vote on plan confirmation,
 
 see
 
 11 U.S.C. § 1126(f), this modification rendered the Indemnified Insurers’ voting objections moot.
 

 The Indemnified Insurers then argued that, notwithstanding this modification, Combustion Engineering had not shown the $3 million set aside to pay the Class Three, Class Four and administrative claims would be sufficient to pay their indemnification claims in full. In response, Combustion Engineering agreed to retain all of its current cash (approximately $50 million) for payment of allowed Class Three, Class Four and administrative claims, and U.S. ABB guaranteed an additional $5 million for the payment of insurer indemnities. Based on the understanding that these proposed modifications would be accepted, the Indemnified Insurers withdrew their feasibility objection.
 

 In its Proposed Findings of Fact and Conclusions of Law, the Bankruptcy Court found the Indemnified Insurers’ voting objection was moot because the Plan left “the insurers unimpaired and, if and when their indemnity claims are allowed, they will be paid 100 percent in either Class 3 or Class 4.”
 
 In re Combustion Eng’g,
 
 295 B.R. at 474. The Bankruptcy Court noted that few insurers actually had indemnity agreements with Combustion Engineering. Moreover, not only was there no current litigation that would implicate the indemnity agreements, it also was unlikely they would ever come into play. The Bankruptcy Court found the state court lawsuits that allegedly implicated the indemnities did not involve contractual indemnities, but rather involved allegations of conspiracy among insurance companies to commit unfair settlement practices under state law. Based on these findings, the Bankruptcy Court estimated the value of current indemnity claims at zero for voting and Plan confirmation purposes:
 

 The indemnities that Combustion Engineering gave under the settlements with insurers are for claims arising under the policies which were released through the settlements. Those claims are not at issue in
 
 Wise
 
 or
 
 Cashman.
 
 The insurers’ argument seems to be that, nonetheless, someone may raise the issue[,] thereby triggering the indemnity. Of course, anyone can sue for anything. The question is, whether the plaintiff can win, something which is improbable. Therefore, the indemnities are valued at zero for purposes of plan voting.
 

 Id.
 
 at 479 n. 32.
 

 In addition, based upon the enhanced pool of assets available to pay Combustion Engineering’s indemnity obligations, the Bankruptcy Court found Combustion Engineering had sufficient assets to pay the Class Three, Class Four and administrative claims in full. In concluding the Plan was “feasible,” the Bankruptcy Court seemed to suggest the Indemnified Insurers still maintained a feasibility objection.
 
 See id.
 
 at 475 (“The insurers contend that the Plan is not feasible in that there will be insufficient funds to pay the indemnities, which I have valued at zero.”). The Bankruptcy Court denied the Indemnified Insurers’ subsequent request to strike these rulings as moot. However, in its supplemental order, the Bankruptcy Court made clear that its findings concerning the scope of the insurers’ indemnity claims were made “solely for the purpose of determining issues regarding voting or feasibility of the Plan.”
 

 The District Court adopted the findings of the Bankruptcy Court with respect to the assertions that the Indemnified Insurers had been denied the right to vote on the Plan. The District Court overruled the objection, holding that the indemnity
 
 *222
 
 claims were unimpaired and unlikely to succeed, and that the Indemnified Insurers lacked standing to raise objections.
 

 The Indemnified Insurers now contend the rulings and findings made by both courts regarding the estimation of indemnity claims constitute impermissible advisory opinions. Accordingly, the Indemnified Insurers request that we vacate the rulings and factual findings made by the Bankruptcy Court and District Court regarding the scope of Combustion Engineering’s indemnity obligations.
 

 In addressing the Indemnified Insurers’ appeal, we begin with the threshold issue of bankruptcy appellate standing, which, as mentioned, is limited to “persons aggrieved” by an order of a bankruptcy court. Under this standard, the Indemnified Insurers have standing to challenge the factual findings related to the value of the indemnification claims only if those findings “diminish[ ] their property, increase[] their burdens, or impairf] their rights.”
 
 In re PWS Holding Corp.,
 
 228 F.3d at 249 (quoting
 
 In re Dykes,
 
 10 F.3d at 187). We do not believe the Indemnified Insurers are aggrieved by the valuation of the indemnity claims for the limited purpose of Plan voting and confirmation.
 

 The injury complained of here relates to the possibility that a future court will mistakenly rely on the Bankruptcy Court’s valuation of the indemnification claims as zero for purposes of voting and Plan confirmation as a ruling on the merits of those claims. We fail to see how this speculative event rises to the level of “direct and pecuniary” harm required for bankruptcy appellate standing. The Bankruptcy Court made clear the estimation of the value of the indemnity claims was limited for purposes of plan confirmation.
 
 In re Combustion Eng’g,
 
 295 B.R. at 475 n. 23. To make the point more explicit, the Bankruptcy Court did not foreclose the possibility that future litigation might alter its valuation of the indemnities: “In the event that there is litigation that kicks the indemnities into play, the merits of the claims will be addressed at that time.”
 
 Id.
 
 at 475. Based upon these clear limitations on the scope of its findings, we believe a future court will understand the limited relevance of the Bankruptcy Court’s estimations on the operation of those indemnities and merits of any related claims. Moreover, even assuming the findings of the Bankruptcy Court and District Court on the valuation of the indemnities are moot, no injury can result from those findings. A ruling or finding on a moot issue can have no precedential or collateral es-toppel effect. It is well-settled that a “party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree.”
 
 Elec. Fittings Corp. v. Thomas & Betts Co.,
 
 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939);
 
 see also In re Arthur Treacher’s Franchise Litig.,
 
 689 F.2d 1137, 1149 n. 16 (3d Cir.1982).
 

 The Indemnified Insurers rely on our opinion in
 
 New Jersey v. Heldor Indus., Inc.,
 
 989 F.2d 702 (3d Cir.1993), for the proposition that a bankruptcy court has no authority to render a decision on a moot issue, and that such rulings and any related findings of fact must be vacated. In
 
 Heldor,
 
 the New Jersey Department of Environmental Protection (“DEP”) objected to a debtor’s proposed settlement agreement relating to the sale of certain assets in bankruptcy. The DEP contended the settlement agreement did not set aside sufficient funds to comply with a New Jersey environmental statute. After pressing its argument in the settlement agreement hearing, but before the bankruptcy judge issued its opinion, the DEP withdrew its objection. Nearly one month
 
 *223
 
 later, the bankruptcy court issued a memorandum opinion overruling DEP’s previously withdrawn objection, and holding that various parts of the New Jersey statute were unconstitutional as violating the Supremacy Clause of U.S. Constitution Article VI and the Takings Clause of the Fifth Amendment. The District Court affirmed, and we reversed on appeal, vacating the bankruptcy court’s order as moot:
 

 [N]o “case” or “controversy” existed between the DEP and the Debtor by August 9, 1991 or, at the latest, when the bankruptcy judge learned of the withdrawal of DEP’s objection on August 28, 1991. After that withdrawal, the controversy between DEP and the Debtor was moot, and the September 6, 1991 memorandum necessarily became an answer to a question not asked. The memorandum was, therefore, in every sense “advisory.”
 

 Heldor,
 
 989 F.2d at 707.
 

 We do not believe
 
 Heldor
 
 compels the remedy the Indemnified Insurers seek here.
 
 Heldor
 
 involved a mootness challenge to a Bankruptcy Court order that addressed the constitutionality of a state statute despite withdrawal of the relevant objection by the state agency charged with enforcing the challenged statute. While acknowledging the withdrawal of the objection in its order, the Bankruptcy Court explained that it nevertheless reached the constitutional issue because of the amount of time it had already expended in writing the opinion.
 
 Id.
 
 at 705. Under those circumstances, we found it appropriate to vacate the entire order of the Bankruptcy Court because it purported to adjudicate a dispute between the debtor and the DEP that no longer existed.
 

 In this case, by contrast, several insurers raised feasibility and voting objections during the Plan confirmation proceedings. As such, these issues remained “live controversies” before the Bankruptcy Court and District Court which had to be resolved prior to Plan confirmation. The valuation determinations were necessary to Plan confirmation, and both courts expressly limited the preclusive effect of their estimates of the indemnities. We see nothing here to confer standing on the Indemnified Insurers as “persons aggrieved.”
 

 D. Certain Cancer Claimants
 

 Finally, we consider the bankruptcy appellate standing of the Certain Cancer Claimants.
 
 [32]
 
 The Plan proponents previously challenged the Certain Cancer Claimants’s standing to object to the use of § 105(a) to extend the channeling injunction to discharge present and future claims against non-debtors. The Bankruptcy Court sustained the standing of the Certain Cancer Claimants to litigate this question as to non-debtor Lummus, but found that they lacked standing to challenge the channeling injunction as to non-debtor Basic. The District Court affirmed. None of the Plan proponents — Combustion Engineering, ABB, Future Claimants’ Representative or Official Committee of Unsecured Creditors — contend the Certain Cancer Claimants lack standing to appeal the confirmation order.
 

 As creditors of the bankruptcy estate, the Certain Cancer Claimants’ interests
 
 *224
 
 are directly and pecuniarily affected by the order of the Bankruptcy Court. Therefore, the Certain Cancer Claimants have appellate standing to challenge Plan confirmation, including the District Court’s grant of injunctive relief under § 105(a) to non-debtor Lummus, the propriety of the § 524(g) injunction, and whether the Plan obtained a valid confirming vote. However, because the Certain Cancer Claimants do not hold any independent claims against non-debtor Basic, we conclude they lack appellate standing to challenge those issues as they relate to Basic.
 
 [33]
 

 IV. “Related to” Jurisdiction
 

 At issue is whether the District Court properly exercised “related to” jurisdiction over the non-derivative asbestos claims against non-debtors Basic and Lum-mus.
 
 [34]
 
 Neither the Bankruptcy Court nor the District Court made jurisdictional findings in support of “related to” jurisdiction. The District Court concluded, however, that the Bankruptcy Court implicitly made the requisite jurisdictional findings as part of its analysis of the § 105(a) channeling injunction. As such, the District Court exercised “related to” jurisdiction over the independent, non-derivative claims based on a “unity of interest” between Combustion Engineering, Basic and Lummus:
 

 Here we have corporate affiliates, shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue. The premises on which the plan is based establish the extensive financial interdependence between the entities. The Court is satisfied that there exists a unity of interest here to support jurisdiction in this court over independent asbestos claims against the non-debtors.
 

 While aspects of the § 105(a) analysis may be relevant to the “related to” jurisdiction inquiry,
 
 [35]
 
 these inquiries are analytically distinct. Section 105(a) permits a bankruptcy court to “issue any order, process or judgment that is necessary or appropriate to carry out the provisions” of the Bankruptcy Code. 11 U.S.C. § 105(a).
 
 [36]
 
 But as the statute makes clear,
 
 *225
 
 § 105 does not provide an independent source of federal subject matter jurisdiction.
 
 [37]
 

 See also In re Johns-Manville Corp.,
 
 801 F.2d 60, 63 (2d Cir.1986) (“Section 105(a) does not, however, broaden the bankruptcy court’s jurisdiction, which must be established separately[.]”). “Related to” jurisdiction must therefore exist independently of any plan provision purporting to involve or enjoin claims against non-debtors.
 
 In re Zale Corp.,
 
 62 F.3d 746, 756 (5th Cir.1995). Although the Plan proponents argue that it is efficacious to use § 105(a) to extend injunctive relief in favor of non-debtors in order to create a “bigger pot” of assets for all of the asbestos claimants, the exercise of bankruptcy power must be grounded in statutory bankruptcy jurisdiction.
 

 A. Overview
 

 Federal bankruptcy jurisdiction is defined by 28 U.S.C. § 1334. Section 1334(b) confers upon the district courts “original and exclusive jurisdiction of all cases under title 11,” and “original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.” 28 U.S.C. § 1334(b). Section 157(a) of the Bankruptcy Code permits district courts to refer most matters to a bankruptcy court.
 
 See
 
 28 U.S.C. §§ 157(a), 151. This broad jurisdictional grant allows bankruptcy courts to “deal efficiently and expeditiously with all matters connected with the bankruptcy estate.”
 
 Celotex Corp. v. Edwards,
 
 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (quoting
 
 Pacor, Inc. v. Higgins,
 
 743 F.2d 984, 994 (3d Cir.1984)).
 

 “Bankruptcy court jurisdiction potentially extends to four types of title 11 matters: ‘(1) cases under title 11, (2) proceeding^] arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11.’”
 
 Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),
 
 372 F.3d 154, 162 (3d Cir.2004) (quoting
 
 Torkelsen v. Maggio (In re Guild & Gallery Plus),
 
 72 F.3d 1171, 1175 (3d Cir.1996)). Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as “core” proceedings; whereas proceedings “related to” a case under title 11 are referred to as “non-core” proceedings.
 
 [38]
 

 In
 
 
 *226
 

 re Resorts Int’l, Inc.,
 
 372 F.3d at 162 (citing 1 Collier on Bankruptcy, ¶ 3.02[2], at 3-35 (15th ed. rev.2003)). Proceedings “related to” a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate.
 
 Celotex,
 
 514 U.S. at 308 n. 5, 115 S.Ct. 1493. We focus our attention on the latter type of proceeding.
 

 Although not defined by statute, we set forth what has become the seminal test for determining “related to” jurisdiction over third-party claims in
 
 Pacor, Inc. v. Higgins,
 
 743 F.2d 984 (3d Cir.1984).
 
 [39]
 
 In that case, John and Louise Higgins brought suit in state court against Pacor, a chemical supplies distributor, for injuries allegedly caused by exposure to asbestos contained in Pacor’s products. Pacor filed a third-party complaint impleading Johns-Manville, the initial asbestos manufacturer. Johns-Manville subsequently filed for Chapter 11 bankruptcy, and the plaintiffs sought to remove their case to the bankruptcy court where the Johns-Manville bankruptcy was proceeding. The bankruptcy court denied removal, and we affirmed.
 

 In evaluating the scope of “related to” bankruptcy jurisdiction, we acknowledged that Congress intended to grant bankruptcy courts broad authority to deal expeditiously with all matters pertaining to the bankruptcy. But we also noted that this power was not without limitation. In defining the appropriate balance, we stated:
 

 The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether
 
 the outcome of that proceeding could conceivably have any effect on the estate being administered in
 
 bankruptcy.... An action is related to bankruptcy if the outcome could alter the debtor’s rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.
 

 Pacor,
 
 743 F.2d at 994 (emphasis in original) (citations omitted).
 

 Applying this test, we concluded “related to” jurisdiction did not extend to the civil proceeding between non-debtors Higgins and Pacor because, “[a]t best, [the lawsuit] is a mere precursor to the potential third party claim for indemnification by [defendant] against [the debtor].”
 
 Id.
 
 at 995. We noted that other cases finding “related to” jurisdiction over actions involving non-debtors involved contractual indemnity obligations between the debtor and non-debtor that automatically resulted in indemnification liability against the debtor.
 
 Id.
 
 (citing cases). By contrast, we found that any judgment against Pacor in the third-party action “could not itself result in even a contingent claim against Manville, since Pacor would still be obligated to bring an entirely separate proceeding to receive indemnification.”
 
 Id.
 
 As such, we concluded that because the debtor Johns-Manville could not be bound automatically by the Higgins-Pacor action, that action was not “related to” the debt- or’s Chapter 11 case.
 

 Recently we affirmed the validity of the
 
 Pacor
 
 test in
 
 In re Federal-Mogul Global, Inc.,
 
 300 F.3d 368 (3d Cir.2002). As in the current case,
 
 Federab-Mogul
 
 involved an asbestos-related bankruptcy. Thousands
 
 *227
 
 of individuals brought personal injury claims in state courts seeking damages for asbestos exposure to certain “friction products,” such as automobile brake pads. Plaintiffs asserted claims against both manufacturers and distributors of friction products, including Federal-Mogul, and also against companies that made products containing friction products, in particular automobile manufacturers that used asbestos-containing brake pads.
 

 Federal-Mogul filed for reorganization under Chapter 11. Thereafter, certain automobile manufacturers sought to remove asbestos-related personal injury claims from state court to the Federal-Mogul bankruptcy proceeding. The automobile manufacturers asserted these claims were “related to” Federal-Mogul’s bankruptcy because they had purchased and used Federal-Mogul’s friction products and therefore would seek indemnification or contribution from Federal-Mogul. The District Court disagreed and denied removal for lack of subject matter jurisdiction, reasoning that “related-to bankruptcy jurisdiction [does] not extend to a dispute between non-debtors unless that dispute, by itself, creates at least the logical possibility that the estate will be affected.”
 
 In re Federal-Mogul Global, Inc.,
 
 282 B.R. 301, 309 (D.Del.2002).
 

 On appeal, the automobile manufacturers again argued the friction products claims were “related to” the Federal-Mogul bankruptcy. Relying in part on
 
 Dow Coming I,
 
 the automobile manufacturers asserted the potential indemnification and contribution claims by the non-debtors against Federal-Mogul provided a sufficient basis for “related to” jurisdiction over claims against the non-debtors. 300 F.3d at 381 n. 8 (citing
 
 Lindsey v. O’Brien (In re Dow Corning Corp.),
 
 86 F.3d 482 (6th Cir.1996)
 
 (“Dow Corning
 
 I”)). We disagreed, reiterating that
 
 Pacor,
 
 and not
 
 Dow Corning I,
 
 provides the controlling standard for assessing “related to” bankruptcy jurisdiction.
 
 Id.
 
 at 381. We also clarified that the potentially expansive language in
 
 Pacor
 
 was subject to the limiting principles announced in that case: “The test articulated in
 
 Pacor
 
 for whether a lawsuit could ‘conceivably’ have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.”
 
 Id.
 
 at 382. Because the potential indemnification and contribution claims against Federal-Mogul had not yet accrued and would require another lawsuit before they could affect Federal-Mogul’s bankruptcy estate, we concluded the district court correctly held it lacked subject matter jurisdiction over the third-party friction product claims.
 

 With these principles in mind we turn to the question whether the non-derivative asbestos claims against non-debtors Basic and Lummus are sufficiently “related to” Combustion Engineering’s Chapter 11 bankruptcy to give rise to federal subject matter jurisdiction.
 

 B. Jurisdiction Over Independent Claims Against Non-Debtors
 

 1. Corporate Affiliation
 

 The “corporate affiliation” between Combustion Engineering, Basic and Lummus identified by the District Court cannot by itself provide a sufficient basis for exercising “related to” jurisdiction. Any corporate relationship between Combustion Engineering, Basic and Lummus derives from the ABB holding company structure and a common parent that is not seeking bankruptcy protection. The record demonstrates that Combustion Engineering, Basic and Lummus are independent corporate entities, with separate and distinct management and operations.
 
 *228
 
 Combustion Engineering does not currently own or control non-debtors Basic and Lummus. A corporate affiliation between lateral, peer companies in a holding company structure, without more, cannot provide a sufficient basis for exercising federal subject matter jurisdiction. Such an affiliation could be relevant to the jurisdictional inquiry if supported by factual findings demonstrating that a suit against Basic or Lummus would deplete the estate or affect its administration. But, as discussed in greater detail, neither the Bankruptcy Court nor the District Court made such findings.
 

 2. Financial Contributions
 

 Combustion Engineering asserts the corporate relationship between itself, ABB, Basic and Lummus gives rise to “related to” jurisdiction because ABB’s significant financial contributions to the Asbestos PI Trust hinged upon a channeling injunction in favor of Lummus. For this reason, Combustion Engineering argues the “entire plan is contingent on the inclusion of claims against Lummus and Basic within the scope of the channeling injunction. If the channeling injunction does not extend to claims against Lummus and Basic, there is no plan; it is that simple.”
 

 The Bankruptcy Court found it was necessary for ABB Limited to sell Lummus in order to contribute the 30 million plus shares of ABB Limited stock to the Plan, and the sale was not possible while Lum-mus retained asbestos liability:
 

 Without an injunction in favor of Basic and Lummus, the shared insurance would not be available to the Asbestos PI Trust, ABB would not contribute and its subsidiaries would not guarantee ABB’s contributions to the Plan and the creditors would not receive the substantial benefits ABB is providing.
 

 In re Combustion Eng’g,
 
 295 B.R. at 483. The District Court likewise concluded that “absent the injunction [in favor of Basic and Lummus,] ABB Limited would not be able to restructure its debt and could not make necessary contributions to the plan.”
 

 Although ABB Limited’s contributions to the Asbestos PI Trust may depend on freeing Lummus and Basic of asbestos liability, and these contributions may inure to the benefit of certain Combustion Engineering asbestos claimants, these factors alone do not provide a sufficient basis for exercising subject matter jurisdiction. If that were true, a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions. As we have made clear, “[s]ubject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.”
 
 In re Resorts Int’l, Inc.,
 
 372 F.3d at 161 (internal citations omitted).
 
 See also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,
 
 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (“[N]o action of the parties can confer subject-matter jurisdiction upon a federal court.”). Although federal bankruptcy jurisdiction is “deliberately expansive” and “conspicuous for its breadth,”
 
 Morales v. TWA, Inc.,
 
 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (citations omitted), it is not without limitation.
 
 See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,
 
 502 U.S. 32, 40, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (noting Congress has vested the bankruptcy courts with “limited authority”). As such, the boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization,
 
 see In re Resorts Int’l, Inc.,
 
 372 F.3d
 
 *229
 
 at 161 (“The source of the bankruptcy court’s subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source ... is 28 U.S.C. §§ 1334 and 157.”), even if we perceive the plan to be in the public interest.
 
 See In re Hechinger Inv. Co. of Del., Inc.,
 
 335 F.3d 243, 256 (3d Cir.2003) (“[I]t is not for us to substitute our view of ... policy for the legislation which has been passed by Congress.”).
 

 Nevertheless, the Plan proponents insist that any unresolved asbestos liability of non-debtor Lummus impedes Combustion Engineering’s ability to craft a plan that includes contributions from ABB Limited. In this regard, Combustion Engineering relies on our decision in
 
 CoreStates Bank, N.A. v. Huls Am., Inc.,
 
 176 F.3d 187 (3d Cir.1999), for the proposition that if litigation against non-debtors prevents the debtor from crossing the finish-line and confirming a plan, then the effect on the estate is immediate and fully sufficient to justify “related to” jurisdiction. We do not read
 
 CoreStates
 
 so broadly.
 

 CoreStates
 
 addressed the question of “related to” jurisdiction over an inter-creditor dispute. Both CoreStates and Huls America, Inc. had extended substantial credit to the debtor, United Chemical Technologies, Inc. (“UCT”), and subsequently entered into a subordination agreement to clarify their respective rights to payment from UCT. Under the terms of the agreement, UCT’s debts to Huls were subordinated to debts owed to CoreStates. Huls further agreed it would not retain any payment by UCT, including payments under a bankruptcy plan, until UCT had paid off its indebtedness to CoreStates in full. After UCT filed for bankruptcy, but before the plan was confirmed, UCT paid $600,000 to Huls in satisfaction of its debt. Citing their subordination agreement, CoreStates demanded Huls pay this sum over to it, and objected to plan confirmation on the ground that the proposed payment to Huls unfairly discriminated among creditors. CoreStates then filed a suit in federal court, alleging Huls was obligated under the subordination agreement to turn over the $600,000 payment. The district court concluded CoreStates’s claim was precluded because CoreStates could have raised its claim in the bankruptcy proceeding along with its objection, but failed to do so. We affirmed.
 

 As a threshold matter, we found that a claim based on the subordination agreement fell within the court’s “related to” jurisdiction. Huls, a creditor of the estate, gave up a claim against the debtor for over $3 million in exchange for an upfront payment of $600,000 under the plan. We reasoned that without this payment Huls “might not have consented to the Plan” and “UCT might have had a much more difficult time having the Plan confirmed.”
 
 Id.
 
 at 204. We found “related to” jurisdiction because resolution of the subordination dispute “conceivably would have impacted upon the debtor’s options in crafting a plan that met with [one of the creditor’s] approval and thereby affected the handling of the bankruptcy estate.”
 
 Id.
 

 We believe
 
 CoreStates
 
 can be distinguished on its facts. It does not support extending “related to” jurisdiction to non-derivative claims against the non-debtors in this case.
 
 CoreStates
 
 involved an inter-creditor dispute that directly concerned assets of the debtor’s estate. As creditors, either CoreStates or Huls had the ability to impede plan confirmation, thereby affecting directly the administration of the bankruptcy estate. By contrast, claimants with independent claims against non-debtors Basic and Lummus are not creditors of Combustion Engineering, and have no ability to affect directly plan ad
 
 *230
 
 ministration.
 
 [40]
 
 Moreover, the matter at issue in
 
 CoreStates
 
 purported to alter the priority of creditors in the bankruptcy process, which would have had an obvious effect on the administration of the bankruptcy estate.
 
 See Pacor,
 
 743 F.2d at 995-96 (dismissing claim for lack of “related to” jurisdiction, noting,
 
 inter alia,
 
 that “[a]ny judgment obtained would thus have no effect on the arrangement, standing, or priorities of [debtor’s] creditors”). By contrast, the claims asserted against Basic and Lummus would not alter the priority of Combustion Engineering’s creditors.
 

 Finally, and most importantly,
 
 CoreS-tates
 
 involved a dispute regarding assets of the debtor’s bankruptcy estate. By contrast, there are no record findings of fact demonstrating that the independent, non-derivative claims against Basic and Lum-mus involve assets of the bankruptcy estate. In fact, the Plan currently provides that these claims will be paid from $38 million in assets contributed by ABB Limited, not Combustion Engineering.
 

 In sum, “related to” jurisdiction cannot be extended to the independent claims against non-debtors Basic and Lummus simply because contributions to the Plan by ABB Limited, itself a non-debtor, purportedly depend on a channeling injunction in their favor.
 

 3. Related Liability
 

 Combustion Engineering insists the Bankruptcy Court properly exercised “related to” jurisdiction over the independent, non-derivative claims against Basic and Lummus for the additional reason that the bankruptcy estate could be affected by future contribution or indemnification claims by a non-debtor. Though Combustion Engineering does not cite to any statutory indemnity obligations or express agreements that would automatically give rise to indemnification obligations with respect to Basic or Lummus, it nonetheless argues the factual findings made by the courts support the possibility of indemnification claims against it. The District Court described a “unity of interest” between Combustion Engineering, Basic and Lummus, based in part on “joint operations at single sites leading to the asbestos personal injury claims at issue,” and “extensive financial inter-dependence.” Furthermore, in discussing the shared insurance policies, the District Court noted that personal injury claims against the “non-debtors would inevitably lead to indemnification claims over against their former parent, Combustion Engineering.” There is also evidence in the record indicating a large majority of Lummus claimants have also asserted claims against Combustion Engineering.
 
 [41]
 

 We believe this factual record does not support “related to” jurisdiction and is readily distinguishable from cases exercising “related to” jurisdiction based on the possibility of contribution or indemnification claims by third parties. For example, in
 
 Dow Coming I
 
 the court found “related to” jurisdiction based on the “identity” of interest created by shared insurance policies and potential claims for contribution and indemnification against Dow Corning by non-debtors. 86 F.3d 482, 493 (6th Cir.1996). In that case, the personal injury liability of both the debtor and non-debtors was based on a single product: silicone gel breast implants. Dow Corning manufactured nearly 50% of all breast im
 
 *231
 
 plants sold in the market and supplied the silicone raw materials to all other manufacturers.
 
 Id.
 
 at 485. In other words, every silicone breast implant involved Dow Corning as either the primary manufacturer or the supplier of the key product input. As one court discussing the facts of
 
 Dow Coming I
 
 explained, “each of the co-defendants was closely involved in using the same material, originating with the debtor, to make the same, singular product, sold to the same market and incurring substantially similar injuries. This circumstance created a unity of identity between the debtor and the co-defendants not present here.”
 
 Arnold v. Garlock, Inc.,
 
 278 F.3d 426, 440 (5th Cir.2001).
 

 The theory of “related to” jurisdiction in
 
 Dow Corning I
 
 was based on the near certainty that Dow Corning would be directly or derivatively liable for any injury resulting from a silicone breast implant because it either manufactured or contributed key supplies to every breast implant on the market. Other courts exercising “related to” jurisdiction over personal injury claims against non-debtors based on the potential for indemnification claims against the debtor have similarly involved either express indemnification obligations not present here,
 
 see A.H. Robins Co., Inc. v. Piccinin,
 
 788 F.2d 994, 1007-08 (4th Cir.1986), or derivative liability,
 
 see MacArthur Co. v. Johns-Manville,
 
 837 F.2d 89, 92-93 (2d Cir.1988).
 

 By contrast, the asbestos-related personal injury claims asserted against Combustion Engineering, Basic and Lummus arise from different products, involved different asbestos-containing materials, and were sold to different markets. The record demonstrates that asbestos-related claims against Combustion Engineering arise from exposure to asbestos insulation used in boilers manufactured by Combustion Engineering for use in power plants and industrial facilities. The asbestos claims against Lummus arise from exposure to water heaters manufactured by Lummus that included asbestos-containing gaskets. Basic’s asbestos liabilities arise from its manufacture of an acoustical plaster containing asbestos. As such, a review of the asbestos-related claims asserted against Combustion Engineering, Basic and Lummus reveals little evidence of derivative liability. Although a majority of the active asbestos claims against Lummus also assert claims against Combustion Engineering, only one Lummus claimant has asserted that Combustion Engineering is derivatively liable for Lummus’ asbestos liability. These distinct products and customers do not establish a “unity of interest” between Combustion Engineering and the non-debtors.
 

 Moreover, we have rejected “related to” jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor. For example,
 
 Pa-cor
 
 involved a third-party personal injury suit against a non-debtor for damages allegedly caused by asbestos supplied by the non-debtor but manufactured by the debt- or. Even though the debtor, Johns-Man-ville, manufactured the asbestos giving rise to the third-party claim, we found no “related to” jurisdiction because the “primary action” — i.e., the suit between the two non-debtors — would not, itself, result in an indemnification claim against the debtor.
 
 See Pacor,
 
 743 F.2d at 995 (“[T]he primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate.... At best, it is a mere precursor to the potential third party claim for indemnification.”).
 

 Likewise, in
 
 Federal-Mogul
 
 we found no “related to” jurisdiction over independent claims against the non-debtor automobile
 
 *232
 
 manufacturers, even though the manufacturers’ products physically incorporated the debtor’s asbestos products. 300 F.3d at 382 (“[W]hether a lawsuit could ‘conceivably’ have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.”). In both cases the unity of exposure created by asbestos contained in a common product was insufficient to give rise to “related to” jurisdiction when the third-party claim would not directly result in liability for the debtor.
 

 At oral argument, Combustion Engineering suggested that common production sites shared by Combustion Engineering, Basie and Lummus were likely to give rise to future indemnification claims. Neither the Bankruptcy Court nor the District Court made any findings of fact on this issue. In any event, we do not believe common production sites alone provide a sufficient basis for the kind of “unity of interest” that could give rise to “related to” jurisdiction. Moreover, any indemnification claims against Combustion Engineering resulting from a shared production facility would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for “related to” jurisdiction.
 

 4. Shared Insurance
 

 The record includes testimony that Combustion Engineering, Basic and Lummus share certain insurance coverage.
 
 [42]
 
 Based on this testimony, the Bankruptcy Court assumed that independent claims against Lummus and Basic would reduce the insurance proceeds available to the estate.
 
 See In re Combustion Eng’g,
 
 295 B.R. at 483 (“Continued lawsuits against Basic and Lummus may drain insurance so that it is not available to fund [Combustion Engineering’s] Plan.”). The District Court made the same assumption (“Insurance policies for which Combustion Engineering, Lummus and/or Basic are co-insureds would be drawn upon by Lummus and Basic claimants, reducing the proceeds available for the personal injury trust.”). The Plan proponents contend that certain insurance policies Combustion Engineering shares with Basic and Lummus operate as indemnification obligations, such that asbestos-related personal injury claims against Basic and Lummus would automatically deplete the insurance proceeds available to Combustion Engineering and thus reduce the assets available to the bankruptcy estate.
 

 Neither the Bankruptcy Court nor the District Court made factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies.
 
 [43]
 
 Courts finding “related to” jurisdiction over claims against non-debtors based in part on shared insurance policies have relied not only on extensive record findings
 
 *233
 
 regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor. For example, in
 
 A.H. Robins,
 
 788 F.2d 994 (4th Cir.1986), the Court of Appeals for the Fourth Circuit found “related to” jurisdiction over non-debtor co-defendants (directors and officers of the debtor) after finding they were entitled to statutory indemnification and were co-insureds under the policies. In reviewing the factual record, the court noted: “The rights of [the non-debtor co-defendants] to indemnity and their status as additional insureds under Robins’ insurance policy are undisputed on the record. That there are thousands of Daikon Shield actions and claims pending is a fact established in the record and the limited fund available under Robins’ insurance policy is recognized in the record.”
 
 Id.
 
 at 1008.
 

 There are no comparable findings of fact in this case with respect to Basic and Lummus, nor any findings on the operative terms of the policies. Although the Plan proponents assured us at oral argument that “[t]he shared insurance has one cap and that all insureds are under the same cap,” we cannot rest the exercise of subject matter jurisdiction on this assertion alone.
 
 [44]
 

 Agathos v. Starlite Motel,
 
 60 F.3d 143, 151 (3d Cir.1995) (“[Setting as an appellate court we are not in a position to make findings of fact.”). Given
 
 Pacor
 
 and Federal-Mogul'''s constraints on related-to jurisdiction, the lack of indemnification obligations (present in
 
 AH. Robins),
 
 the lack of derivative liability or unity of interest (present in
 
 Dow Coming I),
 
 the minimal corporate affiliation of Combustion Engineering with Lummus and Basic, and the indirect effects on the Plan, it is doubtful whether shared insurance would be sufficient grounds upon which to find related-to jurisdiction over independent claims against Basic and Lummus.
 

 Because there are insufficient findings of fact on the current record to assess the matter, we would ordinarily remand on the shared insurance issue. However, because we conclude § 105(a) does not permit the extension of a channeling injunction to the non-derivative claims against non-debtors Basic and Lummus, no further fact finding is required on this point.
 

 V. Section 105(a) Equitable Injunction
 

 The Bankruptcy Court entered a channeling injunction under § 524(g) in favor of Combustion Engineering and also in favor of Basic and Lummus for their derivative asbestos-related claims. The court correctly found that § 524(g) did not authorize a channeling injunction over the independent, non-derivative third-party actions against non-debtors Basic and Lummus. To extend the channeling injunction to include the non-derivative claims against the non-debtors, the Bankruptcy Court relied upon its equitable powers under § 105(a).
 

 Based on the facts here, we do not believe that § 105(a) can be employed to extend a channeling injunction to non-
 
 *234
 
 debtors in an asbestos case where the requirements of § 524(g) are not otherwise met. Because the injunctive action on independent non-derivative claims against non-debtor third parties in this case would violate § 524(g)(4)(A), would improperly extend bankruptcy relief to non-debtors, and would jeopardize the interests of future Basic and Lummus claimants, we will vacate the § 105(a) injunction.
 

 A. The Requirements of Section 524(g)(4)(A)
 

 Section 524(g) provides a special form of supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability. Channeling asbestos-related claims to a personal injury trust relieves the debtor of the uncertainty of future asbestos liabilities. This helps achieve the purpose of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity. At the same time, the rehabilitation process served by the channeling injunction supports the equitable resolution of asbestos-related claims. In theory, a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an “evergreen” source of funding to pay future claims. This unique funding mechanism makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process. To achieve this relief, a debtor must satisfy the prerequisites set forth in § 524(g)
 
 [45]
 
 in addition to the standard plan confirmation requirements.
 
 [46]
 

 Importantly for this case, § 524(g) limits the situations where a channeling injunction may enjoin actions against third parties to those where a third party has derivative liability for the claims against the debtor:
 

 Notwithstanding the provisions of section 524(e), such an injunction may bar
 
 *235
 
 any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor[.]
 

 11 U.S.C. § 524(g)(4)(A)(ii).
 
 [47]
 
 More specifically, the statute identifies the four circumstances under which such third-party liability will arise: “the third party’s ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor,” 11 U.S.C. § 524(g)(4)(A)(ii)(I); “the third party’s involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party,” 11 U.S.C. § 524(g)(4)(A)(ii)(II); “the third party’s provision of insurance to the debtor or a related party,” 11 U.S.C. § 524(g)(4)(A)(ii)(III); or “the third party’s involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party.” 11 U.S.C. § 524(g)(4)(A)(ii)(IV).
 

 The Plan proponents do not contend that Basic and Lummus are “liable for the conduct of, claims against, or demands on” Combustion Engineering, as required by § 524(g)(4)(A)(ii). As the Bankruptcy Court correctly noted, “[t]he Debtor owned [Basic and Lummus]; they did not own Debtor.”
 
 In re Combustion Eng’g,
 
 295 B.R. at 482 n. 41. Certain claims
 

 against Basic and Lummus allege independent liability, wholly separate from any liability involving Combustion Engineering. As the plain language of the statute makes clear, § 524(g)(4)(A) does not permit the extension of a channeling injunction to include these non-derivative third-party actions.
 

 B. Section 105(a)
 

 Recognizing the limitations imposed by § 524(g), the Bankruptcy Court instead relied upon its equitable powers under § 105(a) to expand the scope of the channeling injunction.
 

 Bankruptcy courts are “courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.”
 
 Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.),
 
 352 F.3d 671, 680-81 (2d Cir.2003) (citation omitted);
 
 see also Local Loan Co. v. Hunt,
 
 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (“[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.”). As courts of equity, bankruptcy courts “have broad authority to modify creditor-debtor relationships.”
 
 United States v. Energy Res. Co.,
 
 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990);
 
 see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,
 
 330 F.3d 548, 568 (3d Cir.2003) (en banc) (describing bankruptcy court’s equitable powers to “craft flexible remedies that, while not ex
 
 *236
 
 pressly authorized by the Code, effect the result the Code was designed to obtain”).
 

 Section 105(a) of the Bankruptcy Code expressly provides bankruptcy courts the equitable power to “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.” 11 U.S.C. § 105(a). This section has been construed to give a bankruptcy court “broad authority” to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings.
 
 Energy Res. Co.,
 
 495 U.S. at 549, 110 S.Ct. 2139 (“[Section 105(a) is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.”).
 

 Nevertheless, the equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section “does not ‘authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.’ ”
 
 In re Aquatic Dev. Group, Inc.,
 
 352 F.3d at 680-81 (citation omitted). Importantly for this case, § 105(a) does not “ ‘give the court the power to create substantive rights that would otherwise be unavailable under the Code.’ ”
 
 United States v. Pepperman,
 
 976 F.2d 123, 131 (3d Cir.1992) (quoting
 
 In re Morristown & Erie R.R. Co.,
 
 885 F.2d 98, 100 (3d Cir.1989));
 
 see also In re Barbieri,
 
 199 F.3d 616, 620-21 (2d Cir.1999) (warning the “equitable powers emanating from § 105(a) ... are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules”) (citations omitted).
 

 The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself.
 
 See generally Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (“Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.”). When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed.
 
 See In re Fesco Plastics Corp.,
 
 996 F.2d 152, 154-55 (7th Cir.1993) (“[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code.”);
 
 Resorts Int’l v. Lowenschuss (In re Lowenschuss),
 
 67 F.3d 1394, 1402 (9th Cir.1995) (“Section 105 does not authorize relief inconsistent with more specific law”);
 
 In re Zale Corp.,
 
 62 F.3d at 760 (5th Cir.1995) (“A § 105 injunction cannot alter another provision of the [C]ode.”).
 

 Here, the Bankruptcy Court relied upon § 105(a) to achieve a result inconsistent with § 524(g)(4)(A). Although the Bankruptcy Court has broad equitable authority to craft remedies necessary to facilitate the reorganization of a debtor, this power is cabined by the Code.
 
 Ahlers,
 
 485 U.S. at 206, 108 S.Ct. 963. As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor.
 
 [48]
 
 Because § 524(g) expressly con
 
 *237
 
 templates the inclusion of third parties’ liability within the scope of a channeling injunction — and sets out the specific requirements that must be met in order to permit inclusion
 
 [49]
 
 — the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g).
 
 [50]
 

 It also bears noting that the practical effect of the § 105(a) injunction here is to extend bankruptcy relief to two non-debtor companies outside of bankruptcy. While the § 105(a) injunction may facilitate Combustion Engineering’s reorganization by permitting significant contributions by ABB Limited and its affiliates to the Asbestos PI Trust, it also allows Basic and Lummus to cleanse themselves of non-derivative asbestos liability without enduring the rigors of bankruptcy. Despite their own asbestos-related liabilities, there is no evidence that either Basic or Lum-mus need to reorganize under Chapter 11. If they do, as U.S. companies facing asbestos liabilities both Basic and Lummus could conceivably petition for Chapter 11 reorganization and injunctive relief from those liabilities under § 524(g). Although some asbestos claimants here may benefit from an augmented fund, equity does not permit non-debtor affiliated entities to secure the benefits of Chapter 11 in contravention of the plain language of § 524(g).
 

 In addition, the use of § 105(a) to enjoin and channel the claims of future Basic and Lummus asbestos claimants may jeopardize the rights of those claimants. The several prerequisites set forth in § 524(g) are designed to protect the interests of future claimants whose claims are permanently enjoined. Among these, the plan must be approved by a super-majority of current claimants, and must provide substantially similar treatment to present and future claimants. Furthermore, the court must appoint a futures representative to act as fiduciary for the interests of future claimants.
 
 See
 
 11 U.S.C. §§ 524(g)(2)(B)(ii)(IV)(bb), 524(g)(4)(B)(I), 524(g)(2)(B)(i)(V).
 

 Neither court here made explicit findings whether the § 524(g) requirements were satisfied with respect to the channeling injunction as applied to the independent, non-derivative claims against Basic
 
 *238
 
 and Lummus. Nor did the Bankruptcy Court formally appoint a separate representative to act on behalf of future asbestos claimants asserting non-derivative claims against Basic and Lummus. There is some evidence in the record that Mr. Austern agreed to act in this capacity while also serving as the Combustion Engineering futures representative.
 
 See supra
 
 note 8. But the interests of the future Basic and Lummus asbestos claimants are not necessarily aligned with those of future Combustion Engineering asbestos claimants. The future asbestos claimants of the non-debtors might prefer having recourse against solvent entities
 
 [51]
 
 rather than being limited to proceeding against the Asbestos PI Trust, a limited fund subject to depletion by current and future Combustion Engineering asbestos claimants. As such, the channeling injunction against these future asbestos claimants may not have accorded them the requisite protections. We will vacate the Basic and Lummus channeling injunction because § 105(a) under these facts cannot be used to circumvent the more specific requirements of § 524(g).
 

 VI. Two-Trust Structure
 

 Eighty-seven days before filing its pre-pack bankruptcy, Combustion Engineering transferred more than $400 million in assets to the CE Settlement Trust to partially pay personal injury claims of participating Combustion Engineering asbestos claimants. At the time, the Plan proponents allegedly feared that claimants with settlements pending or awaiting payment would force Combustion Engineering into involuntary bankruptcy and stymie its reorganization effort.
 
 See In re Combustion Eng’g,
 
 295 B.R. at 467 n. 9. Accordingly, payments from the CE Settlement Trust were based upon the length of time a claimant’s case had been pending. Claimants who had settled with Combustion Engineering and were awaiting payment received the greatest compensation (95% of the full liquidated value of their claim); claimants who had agreed to settlement or a dispute resolution process, and whose payment was due at a future date, received less (85%); a third, catch-all category of claimants received an initial payment of 37.5%, with the possibility, if sufficient funds remained, of later recovering up to 75%; and a fourth group of claimants, who came into the process late in the negotiations, agreed to a lesser sum. None of the participating Combustion Engineering claimants received full payment, and the remaining, unpaid portion of each claim was treated as surviving for purposes of bankruptcy creditor status. The surviving “stub claims” enabled CE Settlement Trust participants to vote on the reorganization Plan.
 

 The Bankruptcy Court determined that payments from the CE Settlement Trust were designed “to compensate people who already had claims in the tort system or on file with [Combustion Engineering] and to provide [Combustion Engineering] with a reprieve from litigation.” The District Court likewise determined the purpose of the CE Settlement Trust was to provide Combustion Engineering “a little time, a breathing space, while the pre-packaged plan was negotiated.” The court reasoned the CE Settlement Trust only partially paid claims because “there were simply insufficient funds to pay the settlement trust claimants 100 percent of their
 
 *239
 
 claims,” and not because the settling parties sought to “gerrymander” the vote. The District Court concluded that payments from the CE Settlement Trust did not induce participants to vote in favor of the Plan or otherwise manipulate the voting process.
 

 The Certain Cancer Claimants lodge two primary objections to the two-trust structure. First, they contend it violates the Bankruptcy Code’s “equality among creditors” principle because the CE Settlement Trust participants effectively receive greater compensation for their asbestos claims than similarly situated non-participants. Second, the Certain Cancer Claimants argue the funding of the CE Settlement Trust and creation of the stub claims violate the Code by “artificially impairing” the claims of participants in order to effect an impermissible manipulation of the voting process.
 

 A. Discriminatory Treatment of Claims
 

 “Equality of distribution
 
 among
 
 creditors is a central policy of the Bankruptcy Code.”
 
 Begier v. IRS,
 
 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). The Certain Cancer Claimants contend the Plan violates this principle, as well as the specific requirements of §§ 524(g)(2)(B)(ii)(V) and 547(b), because the two-trust structure provides the CE Settlement Trust participants with preferential treatment over non-participant asbestos personal injury claimants. The Plan proponents maintain this framework complies with the literal terms of the Code. Nonetheless, we believe the Combustion Engineering bankruptcy Plan may impermissibly discriminate against certain asbestos personal injury claimants. Because the record is inadequate to resolve the issue, we will remand for additional fact-finding.
 

 The Bankruptcy Code furthers the policy of “equality of distribution among creditors” by requiring that a plan of reorganization provide similar treatment to similarly situated claims. Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed. Section 1122(a) provides that only “substantially similar” claims may be classified together under a plan of reorganization. Section 1123(a)(4) requires that a plan of reorganization “provide the same treatment for each claim or interest of a particular class.” And § 524(g) states that “present claims and future demands that involve similar claims” must be paid “in substantially the same manner.”
 

 To complement these provisions, which address the treatment of claims post-petition, § 547 operates to ensure that equality among creditors is not undermined by transfers to creditors in contemplation of bankruptcy. Section 547(b) provides that a bankruptcy trustee may avoid any transfer by the debtor:
 

 (1) to or for the benefit of a creditor;
 

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 (3) made while the debtor was insolvent;
 

 (4) made—
 

 (A) on or within 90 days before the date of the filing of the petition; ... and
 

 (5) that enables such creditor to receive more than such creditor would receive if-
 

 (A) the case were a case under chapter 7 of this title; [and]
 

 (B) the transfer had not been made
 

 11 U.S.C. § 547(b).
 

 Section 547(b) furthers equality of distribution among creditors by preventing the
 
 *240
 
 debtor from favoring one creditor or group of creditors over others by transferring property shortly before filing for bankruptcy. The Supreme Court has noted the preference avoidance rule contained in § 547 serves an important purpose in managing the debtor-creditor relationship:
 

 A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debt- or than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate.... [T]he preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debt- or. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.
 

 Union Bank v. Wolas,
 
 502 U.S. 151, 160-61, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (citing H.R.Rep. No. 95-595 at 177-78 (1977)).
 

 Based on the record, we believe the pre-petition payments to the CE Settlement Trust may constitute voidable preferences.
 
 [52]
 
 Eighty-seven days before filing for bankruptcy, while the company was insolvent, Combustion Engineering transferred payment for outstanding asbestos liability to a group of CE Settlement Trust participants who received up to 95% of their claim value — far more than they would have received in a Chapter 7 liquidation had no transfer been made. This suggests that the payments to the settlement trust satisfy at least four of the five criteria under § 547(b).
 

 Prior to filing for bankruptcy, Combustion Engineering transferred over $400 million, or approximately half of its assets, to the CE Settlement Trust for the benefit of participating asbestos claimants, who were then creditors of Combustion Engineering. 11 U.S.C. § 547(b)(1). As such, partial payments from the CE Settlement Trust constituted payments for antecedent debts owed by the debtor. 11 U.S.C. § 547(b)(2). Moreover, Combustion Engineering was insolvent when it funded the pre-petition trust on November 22, 2002, and its petition for voluntary Chapter 11 bankruptcy was filed on February 17, 2003 — eighty-seven days after funding the CE Settlement Trust. 11 U.S.C. § 547(b)(3) and 11 U.S.C. § 547(b)(4).
 

 The only remaining issue is whether the assets transferred to the CE Settlement Trust entitled participants in that Trust to receive more than they otherwise would have received in a Chapter 7 liquidation. 11 U.S.C. § 547(b)(5). Crediting the liquidation analysis conducted by Pamela Zilly, senior managing director of the Blackstone Group, and testimony by Mr. Austern, the Bankruptcy Court concluded the Plan would pay more to future claimants than would be paid under a Chapter 7 bankruptcy or no bankruptcy at all.
 
 See In re Combustion Eng’g,
 
 295 B.R. at 488. Specifically, the Bankruptcy Court found the assets available to Combustion Engineering in Chapter 7 would be between $210 and $250 million, while assets available under the Plan would be between $640 and $789 million as a result of the additional contributions by ABB Limited and other non-debtors.
 
 [53]
 

 Id.
 
 at 485-86. The District
 
 *241
 
 Court likewise dismissed the argument that the pre-petition transfer constituted a voidable preference:
 

 [T]he allegation that the establishment of the settlement trust was a voidable preference is simply a restatement of the argument already dispensed with by comparing the liquidation value of the company with the value paid to claimants under the plan. Without the settlement trust, there would be no plan. It has already been established that future claimants will fare better with the plan than without it.
 

 This analysis was incorrect as a matter of law because a comparison of the funds available for future claimants is not the proper inquiry. Section 547(b)(5) refers to transfers for the “benefit of a creditor” that “enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.” 11 U.S.C. § 547(b)(5). As this provision specifies, the relevant question is whether the CE Settlement Trust participants — not the future claimants' — received more or less than they would have received under Chapter 7 if the pre-petition payments had not been made.
 

 The record suggests that pre-petition settlement participants received more for their asbestos claims than they would have received in a Chapter 7 liquidation. The CE Settlement Trust paid participants up to 95% of their claim value, and, according to the Certain Cancer Claimants’ expert, provided an average payout to participants of 59%. A Chapter 7 liquidation, in contrast, may have yielded an average payout to asbestos claimants of significantly less, perhaps 28% of their claim value.
 
 [54]
 
 Were this disparity established as a matter of fact, the CE Settlement Trust preferences would be voidable under § 547(b).
 

 The pre-petition transfer in this case also implicates the fundamental bankruptcy policy of “equality of distribution among creditors.” In this regard, we consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted.
 
 [55]
 
 Viewing
 
 *242
 
 the Combustion Engineering pre-pack bankruptcy as a whole, the record reveals that it may lack the requisite equality of distribution among creditors. The Plan, as it relates to asbestos claimants, consists of two elements: the pre-petition CE Settlement Trust and the post-petition Asbestos PI Trust.
 
 [56]
 
 Under this interdependent, two-trust framework, the Certain Cancer Claimants, the future asbestos claimants, and other non-parties to the pre-petition settlement appear to receive a demonstrably unequal share of the limited Combustion Engineering fund. The Certain Cancer Claimants’ expert testified that while CE Settlement Trust participants recover, on average, 59% of the liquidated value of their claims, future claimants would recover 18% of the liquidated value of their claims under the Asbestos PI Trust. This disparity, if in fact it exists, is even more striking when considering that Category One claimants in the CE Settlement Trust received 95% of the liquidated value of their claims. But neither the District Court nor the Bankruptcy Court made findings with respect to the recovery of CE Settlement Trust participants relative to non-participating asbestos claimants.
 

 Additionally, there are two considerations here that are absent in the ordinary commercial bankruptcy: the Plan’s treatment of current asbestos claimants relative to future asbestos claimants, and its treatment of malignant asbestos claimants relative to non-malignant asbestos claimants.
 
 [57]
 
 The Certain Cancer Claimants challenge the disparate treatment of current and future asbestos claimants under the two-trust structure, and also whether the most seriously injured asbestos claimants received fair treatment under the Plan. Again, the record is insufficient to rule on these contentions. Neither the Bankruptcy Court nor the District Court evaluated the CE Settlement Trust’s treatment of current, future, malignant and non-malignant asbestos claimants, or evaluated the overall Plan from the perspective of settlement participants versus non-participants and malignant versus non-malignant asbestos claimants. Even absent the Plan’s other defects, the two-trust structure requires a remand for further findings on these issues.
 

 B. Creation of the “Stub Claims”
 

 The Certain Cancer Claimants contend the CE Settlement Trust “artificially impaired” or contrived the stub claims in order to garner sufficient votes in favor of confirmation.
 
 [58]
 
 As a condition of
 
 *243
 
 plan confirmation,
 
 [59]
 
 the court must find “at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.” 11 U.S.C. § 1129(a)(10). A claim is not impaired if the plan “leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest” or if the plan cures or compensates for past default. 11 U.S.C. § 1124(1). “Artificial” impairment occurs when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124. The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors. While there is nothing in either §§ 1129(a)(10) or 1124 expressly prohibiting a debtor from “artificially impairing” the claims of creditors,
 
 [60]
 
 courts have found this practice troubling.
 
 [61]
 

 In the context of this asbestos-related bankruptcy, so do we. Unlike the ordinary commercial bankruptcy, where stub claims may be used to facilitate a workout plan in the overall best interests of creditors, the use of stub claims in this case may constitute “artificial impairment” under § 1129(a)(10).
 

 “The purpose of [§ 1129(a)(10) ] is ‘to provide some indicia of support [for a plan of reorganization] by affected creditors and prevent confirmation where such
 
 *244
 
 support is lacking.’ ”
 
 In re Windsor on the River Assocs.,
 
 7 F.3d at 131 (quoting
 
 In re Lettick Typografic, Inc.,
 
 103 B.R. at 38). As such, § 1129(a)(10) requires that a plan of reorganization pass muster in the opinion of creditors whose rights to repayment from the debtor are implicated by the reorganization. By providing impaired creditors the right to vote on confirmation, the Bankruptcy Code ensures the terms of the reorganization are monitored by those who have a financial stake in its outcome. Bankruptcy provides a framework for the consensual and cooperative reorganization of an insolvent debtor, and “stub claims” negotiated pre-petition may play a role in this process.
 

 But in this case, Combustion Engineering made a pre-petition side arrangement with a privileged group of asbestos claimants, who as a consequence represented a voting majority despite holding, in many cases, only slightly impaired “stub claims.” On the facts here, the monitoring function of § 1129(a)(10) may have been significantly weakened.
 
 See generally John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,
 
 987 F.2d 154, 158 (3d Cir.1993) (stating § 1129(a)(10) “would be seriously undermined if a debtor could gerrymander classes”). This type of manipulation is especially problematic in the asbestos context, where a voting majority can be made to consist of non-malignant claimants whose interests may be adverse to those of claimants with more severe injuries.
 
 See
 
 Stephen J. Carroll, et al.,
 
 Asbestos Litigation Costs and Compensation: An Interim Report
 
 46 (RAND 2002) (reporting that non-malignant claimants typically represent 80% to 90% of outstanding asbestos claims); S. Elizabeth Gibson,
 
 Symposium
 
 — Mass
 
 Torts: A Response to Professor Resnick: Will This Vehicle Pass Inspection?,
 
 148 U. Pa. L.Rev.2095, 2112 (2000) (“A distinct minority — for example, those tort claimants with especially serious injuries and strong cases — might get outvoted by a large number of holders of small claims who favor a quick pay-out of relatively small amounts with little proof required.”).
 
 [62]
 

 Here, Combustion Engineering made pre-petition payments to current asbestos claimants that exceeded any recovery obtainable by other current asbestos claimants (such as the Certain Cancer Claimants) in bankruptcy.
 
 [63]
 
 As a result, the CE Settlement Trust participants, many of whom received as much as 95% of the full liquidated value of their claims pre-petition, had little incentive to scrutinize the terms of the proposed Plan. Rather, their incentive appears to have been otherwise, given that the favorable prepetition settlements were conditioned, at least implicitly, on a subsequent vote in favor of the Plan.
 

 Furthermore, the Plan initially provided a release for all avoidance and/or prefer
 
 *245
 
 ence actions against participants in the CE Settlement Trust. Although the release was subsequently removed from the Plan, this did not occur until after the solicitation and voting process was completed. Thus, when participants in the pre-petition CE Settlement Trust voted on the Plan, they possessed a significant financial incentive directly opposed to nonparticipants, whose only recourse was to the post-petition Asbestos PI Trust. This conflict was not considered by either the Bankruptcy Court or the District Court. In these circumstances, Combustion Engineering’s use of stub claims may constitute “artificial impairment” in violation of § 1129(a)(10).
 

 The Combustion Engineering stub claims also implicate due process.
 
 [64]
 
 In the resolution of future asbestos liability, under bankruptcy or otherwise, future claimants must be adequately represented throughout the process.
 
 Amchem,
 
 521 U.S. at 625-28, 117 S.Ct. 2231;
 
 Ortiz, 527
 
 U.S. at 856, 119 S.Ct. 2295; 11 U.S.C. § 524(g)(4)(B)(I).
 
 [65]
 
 Here, the first phase of the integrated, global settlement — -the establishment of the CE Settlement Trust — included neither representation nor funding for future and other non-participating claimants.
 

 Had the future and other nonparticipating asbestos claimants been adequately represented throughout the reorganization process, including the CE Settlement Trust negotiations, then perhaps the corresponding stub claims would demonstrate the “indicia of support by affected creditors” required under § 1129(a)(10).
 
 In re Windsor on the River Assocs., 7
 
 F.3d at 130-32. But they were not. Instead, as discussed, a disfavored group of asbestos claimants, including the future claimants and the Certain Cancer Claimants, were not involved in the first phase of this integrated settlement. The result was a Plan ratified by a majority of “stub votes” cast by the very claimants who obtained preferential treatment from the debtor. As noted, an estimated 99,000 of the approximately 115,000 “valid” confirmation votes appear to have been stub claim votes. Given this structural inadequacy,
 
 see Ortiz,
 
 527 U.S. at 855-57, 119 S.Ct. 2295, the Plan may have lacked the requisite “indicia of support” among creditors. We recognize that stub claims are often used in ordinary commercial bankruptcies without generating the problems described here. But in this case, their use is problematic. We will remand for further consideration of “artificial impairment” under § 1129(a)(10).
 
 [66]
 

 
 *246
 
 Additionally, the Certain Cancer Claimants contend that the use of stub claims within a two-trust framework violates the good faith requirement of the Bankruptcy Code. As a condition of plan confirmation, a debtor must propose a plan of reorganization “in good faith and not by any means forbidden by law.”
 
 [67]
 
 11 U.S.C. § 1129(a)(3). Courts and commentators have recognized the good faith requirement provides an additional check on a debtor’s intentional impairment of claims.
 
 See In re Greate Bay Hotel & Casino, Inc.,
 
 251 B.R. at 240 (“Of course, the classification and treatment of classes of claims is always subject to the good faith
 
 *247
 
 requirements under § 1129(a)(3).”);
 
 see also
 
 7 Collier on Bankruptcy ¶ 1129.03[10], at 1129-62 (15th ed. rev.2000) (“Because the test of [§ 1129(a)(10) ] is somewhat mechanical on its face, and thus would not under a plain meaning analysis permit of an inquiry into motive, courts have indicated that attempts to manufacture artificially, or to gerrymander, classes to obtain an accepting impaired non-insider class raise questions of good faith.”). Although the Code does not define “good faith” in the context of § 1129(a)(3), we have stated that “[f]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.”
 
 In re PWS Holding Corp.,
 
 228 F.3d at 242 (citing
 
 In re Abbotts Dairies of Pa., Inc.,
 
 788 F.2d 143, 150 n. 5 (3d Cir.1986)).
 

 Both the Bankruptcy Court and District Court found the Plan satisfied the good faith requirement of § 1129(a)(3). In rejecting the proposition the Plan had been proposed in bad faith, the District Court concluded “it cannot be seriously argued that the good faith requirements of section 1129 would bar a plan intended to pay victims and resolve crippling and uncertain tort liabilities.” The District Court found Combustion Engineering created the stub claims merely to purchase “a little time, a breathing space,” and because “there were simply insufficient funds to pay the settlement trust claimants 100 percent of their claims.”
 

 The District Court also found the purported goal of the Plan in paying asbestos claimants and definitively resolving the asbestos liabilities of the debtor was consistent with the objectives of the Bankruptcy Code. The Certain Cancer Claimants contend the purpose of the two-trust framework was to secure improperly the required confirmation votes from a privileged group of claimants at the expense of the future and other non-participating claimants. We will remand for further consideration of good faith in light of the issues we have identified with the two-trust structure.
 
 [68]
 

 
 *248
 
 VII. Going Concern Requirement: Section 524(g)(2)(B)(i)(II)
 

 Section 524(g)(2)(B)(i)(II) provides that the asbestos personal injury-trust must be “funded in whole or in part by the securities of 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends.” The implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an “evergreen” funding source for future asbestos claimants.
 
 [69]
 
 Both the Bankruptcy Court and the District Court found the reorganized Combustion Engineering would engage in business operations after consummation of the Plan. The Bankruptcy Court found Combustion Engineering “had a continuing real estate business .... [and] is continuing in business post-confirmation.”
 
 In re Combustion Eng’g,
 
 295 B.R. at 485. The District Court likewise overruled a challenge to the § 524(g) channeling injunction after concluding “the reorganized Combustion Engineering will have a real estate business in which it will own and lease properties.”
 

 The record demonstrates the following facts. Combustion Engineering’s post-confirmation business operations would be, at most, minimal. Combustion Engineering would emerge from Chapter 11 with no employees, no products or services, and in a cash neutral position. Its sole business activity would relate to the ownership of an environmentally contaminated piece of real estate in Connecticut (a so-called “brown field”) and related lease activities.
 
 [70]
 

 Although it is debatable whether Combustion Engineering could satisfy § 524(g)(2)(B)(i)(II), it does not appear that the Certain Cancer Claimants raised this issue. They are the only parties, however, with standing to do so. While the Objecting Insurers argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter. Therefore, we need not address it.
 

 VIII. Conclusion
 

 For the foregoing reasons, we will vacate the order of the District Court confirming Combustion Engineering’s Plan of Reorganization and remand to the District
 
 *249
 
 Court for proceedings consistent with this opinion.
 

 [1]
 

 . The Travelers Indemnity Company and certain affiliates and Travelers Casualty and Surety Company tk/a The Aetna Casualty and Surety Company withdrew its appeal on June 2, 2004, following a settlement of its coverage with Combustion Engineering. Likewise, appellant Evanston Insurance Company settled its dispute with Combustion Engineering pri- or to oral argument, and stipulated dismissal of its appeal on January 7, 2004.
 

 [2]
 

 . The District Court's Confirmation Order, entered August 13, 2003, affirmed three separate recommendations of the Bankruptcy Court: (1) Order Approving The Disclosure Statement But Recommending Withholding Of Confirmation Of The Plan Of Reorganization For Combustion Engineering For Ten Days,
 
 In re Combustion Eng’g,
 
 295 B.R. 459 (Bankr.D. Del. 2003); (2) Findings Of Fact And Conclusions Of Law Regarding Core Matters And Proposed Findings Of Fact And Conclusions Of Law Regarding Non-Core Matters,
 
 In re Combustion Eng’g,
 
 295 B.R. 459 (Bankr.D.Del. June 23, 2003); and (3) Supplemental And Amendatory Order Making Additional Findings And Recommending Confirmation Of Plan Of Reorganization.
 

 [3]
 

 .See, e.g.,
 
 Stephen J. Carroll et al.,
 
 Asbestos Litigation Costs and Compensation: An Interim Report
 
 (RAND 2002); Deborah Hensler et al.,
 
 Asbestos in the Courts: The Challenge of Mass Toxic Torts
 
 (RAND 1985); James Kaka-lik et al.,
 
 Costs of Asbestos Litigation
 
 (RAND 1983).
 

 [4]
 

 . A pre-packaged (or “pre-pack”) bankruptcy allows a debtor to obtain votes of its creditors on a plan of reorganization before actually filing a petition for Chapter 11 relief. At the time the debtor files for relief, it presents the bankruptcy court with a plan of reorganization and a tally of creditors’ votes approving the plan. To gain approval, the plan must receive (1) a majority of votes by number by class and (2) two-thirds of votes weighted by the amount of allowed claims for that class. 11 U.S.C. § 1126(c). In addition, if, as here, the plan contains a § 524(g) channeling injunction, it must be approved by 75% of the debtor's current asbestos claimants by number. See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).
 

 [5]
 

 . By the time its bankruptcy petition was filed, Combustion Engineering had exhausted its primary insurance coverage for products liability or settled with its primary insurance carriers. The Bankruptcy Court found that the pre-petition insurance settlements with Combustion Engineering account for total payments of $90.5 million, and further found there was approximately $200 million in unexhausted excess insurance policy limits, although certain excess insurance carriers dispute coverage.
 
 In re Combustion Eng’g,
 
 295 B.R. at 464.
 

 [6]
 

 . As a Swiss Corporation, ABB Limited is not subject to the United States bankruptcy laws. U.S. ABB, however, is incorporated in the State of Delaware.
 

 [7]
 

 . We note that counsel for Certain Underwriters at Lloyd’s of London claimed at oral argument that ABB sold its oil, gas and petrochemical division earlier this year for $950 million, but retained ownership of ABB Lum-mus Global. An ABB press release indicates it sold the group in January 2004 to a private equity consortium for $925 million, with potential deferred consideration of an additional $50 million. ABB Lummus Global was not included in the sale.
 

 [8]
 

 . Mr. David Austern was appointed to act as future claims representative for Combustion Engineering under 11 U.S.C. § 524(g)(4)(B)(i). There is conflicting evidence regarding Mr. Austern’s role as representative for future Basic and Lummus claimants. In a letter from Mr. Austern to Lummus, dated April 10, 2003, Mr. Austern indicated he was asked to serve as futures representative for Lummus and Basic. The record also demonstrates that Mr. Austern conducted certain due diligence regarding the proposed treatment of future Basic and Lummus claims under the Plan. But Mr. Austern was not officially appointed by the Bankruptcy Court to serve as futures representative for Basic and Lummus claimants, and he testified that as of January 19, 2003, there was no representative for future Basic and Lummus claimants.
 

 [9]
 

 . The Master Settlement Agreement was amended on January 29, 2003 to allow additional qualified claimants to enter the CE Settlement Trust through February 20, 2003.
 

 [10]
 

 . These enhancements included: (1) guarantees by ABB subsidiaries as credit support for ABB Limited's obligations under the Plan; (2) assurances that the applicability of the § 524(g) injunction would be reevaluated if ABB Limited defaulted on its obligations under the Plan; (3) limited consent by ABB Limited to United States jurisdiction; (4) an additional $100 million payment by ABB Limited between 2006-2011 with $50 million of such payment contingent upon ABB Limited’s EBIT (earnings before income tax) margins; (5) credit support for all of ABB Limited’s $350 million contribution; (6) modification of Combustion Engineering’s stock contribution to a $20 million note convertible to 80% of Combustion Engineering’s outstanding stock upon successful completion of environmental remediation of certain Combustion Engineering properties; (7) U.S. ABB assuming liability for remediating one of Combustion Engineering's environmental liability sites (with the cost of remediation estimated at $100 million); (8) payment by ABB Limited of $5 million in cash to the Asbestos PI Trust upon the successful sale of Lummus; and (9) acceleration of $250 million in payments from ABB Limited from five years to three years.
 

 [11]
 

 . The insurance-related contributions to the Asbestos PI Trust are governed by an Insurance Assignment Agreement. Under that agreement, Combustion Engineering, ABB Limited, Lummus and Basic transferred to the Asbestos PI Trust their respective rights to receive $94.5 million under various insurance settlement agreements. The settlement proceeds include pre-petition settlements negotiated between Combustion Engineering and the Indemnified Insurers that released the Indemnified Insurers from further obligations under their respective policies. Under these so-called insurance “buy-backs” Combustion Engineering was to receive a settlement payment and the insurers were to be released of all costs and burdens arising out of Combustion Engineering’s asbestos liability. As part of the settlement agreements, Combustion Engineering also agreed to indemnify the settling insurers for costs and expenses incurred in defending suits involving Combustion Engineering's asbestos liability.
 

 It is unclear from the record how the Bankruptcy Court arrived at an estimate of $320 million for the insurance proceeds contributed by Combustion Engineering to the Asbestos PI Trust. Combustion Engineering represents that its policies and settlement agreements covering asbestos personal injury claims are collectively worth between $242 and $294 million. The actual coverage under policies with a face amount estimated at $200 million has yet to be determined.
 

 [12]
 

 .
 
 Combustion Engineering and its primary insurers entered into an agreement in 1983 under which Travelers Indemnity Co. exclusively handled Combustion Engineering's asbestos claims. In 1989, Combustion Engineering and Travelers agreed Combustion Engineering would remain solely responsible for handling asbestos claims. Since that time, Combustion Engineering has delegated claims handling responsibility to CVCSC.
 

 [13]
 

 . Article 7.2.13 of the Plan gives the Asbestos PI Trust the power to "initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all actions arising from or related to the Asbestos Insurance Rights.” Although Article 7.4.2 enjoins all entities (except the Asbestos PI Trust and the reorganized Combustion Engineering) from pursuing asbestos-related claims against the qualifying insurers, the Trust retains the right to "assign a cause of action against Asbestos Insurance Entity to a holder of an Asbestos PI Trust Claim.”
 

 [14]
 

 . There is a factual discrepancy in the record on this point. The Declaration of Wendy Cappola certifying the tabulation of ballots states the total number of valid ballots as 115,787. This declaration does not provide information on the total number of valid accepting or rejecting votes. Combustion Engineering’s confirmation hearing exhibit places the number of accepting votes at 111,986, and the number of rejecting votes at 3,594. These numbers add up to 115,580.
 

 [15]
 

 . The Certain Cancer Claimants are 291 persons, or their legal representatives if deceased, suffering from cancers caused by exposure to asbestos contained in Combustion Engineering's products. All of the Certain Cancer Claimants are creditors of Combustion Engineering under § 101(10) of the Bankruptcy Code and are identified in a Bankruptcy Rule 2019 statement. In addition, some of the Certain Cancer Claimants hold independent claims against Lummus. Others still hold claims against both Combustion Engineering and Lummus. There is no indication in the record or the briefs of the parties that any of the Certain Cancer Claimants hold independent claims against Basic.
 

 [16]
 

 .The appellant insurance companies include Allianz Insurance Company, Allstate Insurance Company, Century Indemnity Company, Continental Casualty Company and Transportation Insurance Company, Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies, Evans-ton Insurance Company, Everest Reinsurance Company, 1/k/a Prudential Reinsurance Company, First State Insurance Company, Hartford Accident and Indemnity Company, North River Insurance Company and TIG Insurance Company, OneBeacon America Insurance Company, f/k/a Commercial Union Insurance Company, and Travelers Indemnity Company and Certain affiliates and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company. Evanston Insurance Company and Travelers either settled or stipulated dismissal of their appeals before we heard argument.
 

 [17]
 

 . Nos. 03-3392, 03-3414, 03-3425, 03-3436, 03-3437, 03-3445, 03-3446, 03-3450, 03-3451, 03-3452, 03-3458, 03-3468, 03-3492.
 

 [18]
 

 . No. 03-3415.
 

 [19]
 

 . The Confirmation Order constitutes a final order of the District Court under its original jurisdiction under 28 U.S.C. §§ 157(c)(1) and 1334. Our jurisdiction is based on 28 U.S.C. § 1291.
 
 See In re
 
 PWS
 
 Holding Corp.,
 
 228 F.3d 224, 235 (3d Cir.2000);
 
 In re Marvel Entm’t Group, Inc.,
 
 140 F.3d 463, 470 (3d Cir.1998). We review the District Court’s conclusions of law de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof.
 
 Gillman v. Cont’l Airlines (In re Cont’l
 
 Airlines), 203 F.3d 203, 208 (3d Cir.2000).
 

 [20]
 

 . The "persons aggrieved" standard appeared originally in section 39(c) of the Bankruptcy Act of 1898.
 
 See
 
 11 U.S.C. § 67(c) (1976) (limiting appellate standing in bankruptcy cases to "persons aggrieved by an order of a referee”). Although this provision was eliminated in the 1978 amendments to the Bankruptcy Code, federal courts retained the "persons aggrieved” standard as a prudential standing limitation for bankruptcy appeals.
 
 See Travelers Ins. Co. v. H.K. Porter Co.,
 
 45 F.3d 737, 741 (3d Cir.1995).
 

 [21]
 

 . This restrictive approach to bankruptcy appellate standing contrasts with the broad right of participation in the early stages of a bankruptcy proceeding. Under Bankruptcy Code § 1128(b), any "party in interest” may object to plan confirmation during the confirmation hearing. 11 U.S.C. § 1128(b). The Code defines "party in interest” to include "the debtor, the trustee, a creditors’ committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee.”
 
 Id.
 
 § 1109(b). This list is not exhaustive, however,
 
 id.
 
 § 102(3), (5), and § 1109(b) has been construed to create a broad right of participation in Chapter 11 cases.
 
 See In re Amatex Corp.,
 
 755 F.2d 1034, 1042 (3d Cir.1985) ("[T]he predecessor provisions of section 1109(b) of the Code constituted an effort to encourage and promote greater participation in reorganization cases .... [and] [s]ection 1109(b) continues in this tradition[J”) (citations omitted);
 
 In re PWS Holding Corp.,
 
 228 F.3d at 249 (Section 1109(b) "confers broad standing at the trial level”).
 

 [22]
 

 . The Objecting Insurers include appellants Allianz Insurance Company, Continental Casualty Company and Transportation Insurance Company, Evanston Insurance Company, Everest Reinsurance Co. frlt/a Prudential Reinsurance Co., First State Insurance Company, Hartford Accident and Indemnity Company, and North River Insurance Company and TIG Insurance Company. Appellants North River Insurance Company and TIG Insurance Company are situated somewhat differently than the other Objecting Insurers. North River and TIG International, as successor by merger to International Insurance Company, are also plaintiffs in an adversary proceeding pending in the Bankruptcy Court in which they contend they have no further obligations under certain of their insurance policies included in Debtor's Plan of Reorganization. In the event their positions are ultimately rejected in the Bankruptcy Court, they join in the briefs of First State. However, North River's policies were issued only to non-debtor Basic. As such, North River contends its interests are also similar to those of the London Market Insurers, and joins in the London Market Insurers’ brief in the event its arguments to the Bankruptcy Court are ultimately rejected.
 

 [23]
 

 . As noted, Appellant North River Insurance Company issued insurance policies only to non-debtor Basic, and joins in the London Market Insurers' brief in the event its arguments currently pending before the Bankruptcy Court are rejected.
 

 [24]
 

 . Only classes of creditors that are “impaired” by the plan are entitled to vote on plan confirmation. 11 U.S.C. § 1126(f). “Impairment” is defined in § 1124, which provides in part:
 

 ... a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -
 

 (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.
 

 11 U.S.C. § 1124.
 

 [25]
 

 . As noted, the super-preemptory provision, as modified by the District Court, provides:
 

 [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway operate to, or have the effect of, impairing the insurers’ legal, equitable or contractual rights, if any,
 
 in respect of any claims (as defined by section 101(5) of the Bankruptcy Code).
 
 The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements,
 
 and under applicable law
 
 (emphasis added to show District Court's changes).
 

 [26]
 

 .As noted, the "neutrality” provision provides:
 

 Nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Insurance Settlement Agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or ex-
 
 *217
 
 elusions contained in the Subject Insurance Policies and the Subject Insurance Settlement Agreements, including, but not limited to, any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.
 

 [27]
 

 . Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns its interests in bankruptcy. 11 U.S.C.
 
 *219
 
 § 541(c)(1) (‘'[A]n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable non-bankruptcy law — (A) that restricts or conditions transfer of such interest by the debtor”). The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate. Section 1123(a)(5) provides:
 

 Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
 

 (5) provide adequate means for the plan's implementation, such as
 

 (B) transfer of all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of such plan.
 

 11 U.S.C. § 1123(a)(5).
 

 [28]
 

 .As discussed, standing to challenge the super-preemptory provision does not provide the Objecting Insurers or London Market Insurers standing to challenge all aspects of Plan confirmation.
 
 See Int’l Primate Prot. League,
 
 500 U.S. at 77, 111 S.Ct. 1700 (“[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents"). We also note that the issues raised in the Objecting Insurers' appeal largely mirror those raised by the Certain Cancer Claimants. We have generally taken a restrictive view of third-party prudential standing in the bankruptcy context.
 
 See In re
 
 PWS
 
 Holding Corp.,
 
 228 F.3d at 248 ("Third-party standing is of special concern in the bankruptcy context, where ... one constituency ... seeks to disturb a plan of reorganization based on the rights of third-parties[.] In this context ... courts have often denied standing as to any claim that asserts only third-party rights.”).
 

 [29]
 

 . The Indemnified Insurers include: Century Indemnity Company (as successor to CCI Insurance Company, successor to Insurance Company of North America); Pacific Employers Insurance Company; Central National Insurance Company of Omaha (solely with respect to policies issued through its managing general agent, Cravens, Dargan & Company, Pacific Coast); and OneBeacon America Insurance Company,
 
 i/k/a.
 
 Commercial Union Insurance Company.
 

 [30]
 

 . As they state in their brief, the Indemnified Insurers are not the only insurers to have entered into pre-petition settlement agreements that imposed indemnification obligations on Combustion Engineering.
 

 [31]
 

 .
 
 See Wise v. Travelers Indem. Co.,
 
 No. 01-C-599 (Cir. Ct. of Berkeley County, W. Va. filed Oct. 25, 2001), and
 
 Cashman v. Travelers Indem. Co.,
 
 No. 02-2-56-H (Super. Ct. of Suffolk County, Mass, filed May 9, 2002).
 

 [32]
 

 . As noted, the Certain Cancer Claimants are 291 persons, or (if deceased) their legal representatives, suffering from cancers allegedly caused by exposure to asbestos contained in Combustion Engineering's products. All of the Certain Cancer Claimants are creditors under § 101(10) of the Bankruptcy Code and are identified in a Bankruptcy Rule 2019 Statement. Some of the Certain Cancer Claimants hold separate claims against both Combustion Engineering and Lummus; none hold separate or joint claims involving Basic.
 

 [33]
 

 . Nevertheless, because the District Court lacked jurisdiction over non-derivative claims against Basic, and because we will vacate confirmation of the Plan on substantive grounds, Basic’s § 105(a) channeling injunction is also invalid.
 

 [34]
 

 . The parties do not dispute that the District Court properly exercised subject matter jurisdiction over the asbestos personal injury claims against Combustion Engineering. We review de novo whether the District Court had subject matter jurisdiction over non-derivative third-party claims against non-debtors Basic and Lummus.
 
 Bracken v. Matgouranis,
 
 296 F.3d 160, 162 (3d Cir.2002).
 

 [35]
 

 . For example, record evidence of an indemnity obligation under which a suit against a non-debtor automatically depletes the assets of the debtor's estate may be relevant to ascertaining an "identity of interest" between the debtor and non-debtor and also support "related to” jurisdiction.
 
 See, e.g., Dow Corning II,
 
 280 F.3d at 658 (holding that a "bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor” where, among other conditions, "[tjhere is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate”). By contrast, other aspects of the § 105(a) inquiry— for example, whether the injunction is essential to the reorganization, or the non-debtor contributed substantial assets to the reorganization — may have little or no bearing on the threshold jurisdictional inquiry.
 

 [36]
 

 . Section 105 provides bankruptcy courts with powers of equity similar to those granted to federal courts under the All Writs Act, including writs of injunction.
 
 See
 
 H.R.Rep. No. 95595, at 316-17 (1977),
 
 reprinted in
 
 1978 U.S.C.C.A.N. 5963, 6273-74 ("Section 105 is similar in effect to the All Writs Statute, 28 U.S.C. § 1651.... The section is repeated here for sake of continuity from cur
 
 *225
 
 rent law and ease of reference, and to cover any powers traditionally exercised by a bankruptcy court that are not encompassed by the All Writs Statute.”). The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions.” 28 U.S.C. § 1651.
 
 See generally
 
 Ralph Brubaker,
 
 Nondebtor Releases and Injunctions in Chapter 11,
 
 72 Am. Bankr.LJ. 1, 15-16 (1998).
 

 [37]
 

 . Section 105(c) provides:
 

 The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in [the Judicial Code]. This subsection shall not be interpreted to exclude bankruptcy judges ... from its operation.
 

 11 U.S.C. § 105(c).
 

 [38]
 

 . "[C]ases under Title 11," as used in 28 U.S.C. § 1334(a), "refers merely to the bankruptcy petition itself.”
 
 In re Marcus Hook Dev. Park, Inc.,
 
 943 F.2d 261, 264 (3d Cir.1991) (quoting
 
 Matter of Wood,
 
 825 F.2d 90, 92 (5th Cir.1987)). The term "proceeding,” on the other hand, as used in 28 U.S.C. § 1334(b), refers "to the steps within the 'case' and to any subaction within the case that may raise a disputed or litigated matter.”
 
 In re Wolverine Radio Co.,
 
 930 F.2d 1132, 1141 n. 14 (6th Cir.1991) (citing 2 Collier on Bankruptcy ¶ 301.03 (15th ed.1990)). Put differently, "anything that occurs within a case is a proceeding,”
 
 see
 
 1 Collier on Bankruptcy ¶ 3.01[4][b] at 3-19 (15th ed. rev.2003) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess.
 
 *226
 
 445 (1977)), including all "controversies, adversary proceedings, contested matters, suits, actions or disputes.”
 
 Id.
 
 ¶3.01[3] at 3-13.
 

 [39]
 

 . The Supreme Court has affirmed the
 
 Pacor
 
 test for "related to” jurisdiction.
 
 Celotex,
 
 514 U.S. at 308, 115 S.Ct. 1493.
 

 [40]
 

 . Of course, the creditor status of third-party litigants in a civil proceeding is not a prerequisite for establishing "related to” jurisdiction.
 

 [41]
 

 . Specifically, out of the 8,017 active Lum-mus claims, 7,446 also assert claims against Combustion Engineering.
 

 [42]
 

 . The record states: “Lummus and Basic shared, at some point, respectively, in the Combustion Engineering insurance program” (testimony of Scott Gilbert); (“Q: Lummus is — Lummus and Combustion Engineering have shared insurance applicable to asbestos personal injury claims in certain periods of time? A: Yes, they have.”) (testimony of John P. Brett); ("Since 1990, both Lummus and Combustion Engineering were insured under the ABB insurance program and were covered by ABB insurance policies that extended to ABB companies.”) (deposition of John P. Brett).
 

 [43]
 

 . Although there is testimony in the record that both Combustion Engineering and Lum-mus were insured under an ABB insurance program, the Bankruptcy Court made no findings in this regard. Moreover, although the Bankruptcy Court found that Combustion Engineering and Lummus shared insurance for the period of 1963 to 1985, it did not make any findings regarding the terms, scope or operation of those policies.
 

 [44]
 

 . Although we have said in certain situations that "related to” jurisdiction may be determined by "speculating whether the ultimate outcome of the litigation could conceivably affect the bankrupt estate,”
 
 Copelin v. Spirco, Inc.,
 
 182 F.3d 174, 179 (3d Cir.1999), this determination must meet the requirements of "related to” jurisdiction that we have set forth and also must be supported by findings of fact and not merely the general assertions of the plan proponents. Moreover,
 
 Copelin
 
 is not analogous. In
 
 Copelin,
 
 we held that the Bankruptcy Court had "related to” jurisdiction over the debtor’s motion to enforce its reorganization plan ahead of a state court judgment creditor's enforcement action. The debtor's motion, though it involved the enforcement of a state court judgment, had as its underlying subject matter the rights and liabilities of the bankrupt estate, and it was clear its outcome could conceivably affect the estate.
 

 [45]
 

 . There are many statutory prerequisites imposed by § 524(g). To qualify for its protections, a court must find that the debtor has been named in an action for damages allegedly caused by asbestos, that the debtor is likely to be subject to substantial demands for payment in the future arising out of the same or similar conduct, that the amounts and timing of such future claims are uncertain, and that permitting the pursuit of such claims outside the trust mechanism would threaten the plan’s attempts to deal equitably with current and future demands. 11 U.S.C. §§ 524(g)(2)(B)(i)(I), (ii)(I-III). The trust itself must also satisfy certain standards under § 524(g) in order to qualify for the issuance of a channeling injunction directing all future claims to the trust: the trust must assume the liabilities of the debtor for current and future claims and must be funded at least in part by the securities of the debtor; the trust must either own, or be entitled to own, the majority of the voting shares of the debtor, its parent, or its subsidiary; the trust must use its assets to pay future claims and demands; and the trust must provide for mechanisms ensuring its ability to value and pay present and future claimants in substantially the same manner. 11 U.S.C. §§ 524(g)(2)(B)(i)(I)-(IV), (ii)(V).
 

 Many of these requirements are specifically tailored to protect the due process rights of future claimants. For example, a court employing a § 524(g) channeling injunction must determine that the injunction is "fair and equitable” to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), and must appoint a futures representative to represent their interests. 11 U.S.C. § 524(g)(4)(B)(I). The court must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner.” 11 U.S.C. § 524(g)(2)(B)(ii)(V). Finally, the statute requires that a 75% super-majority of claimants whose claims are to be addressed by the trust vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).
 

 [46]
 

 . The injunctive relief available under § 524(g) may only be exercised "in connection with” an "order confirming a plan of reorganization under Chapter 11.” 11 U.S.C. § 524(g)(1)(A).
 

 [47]
 

 . We note this provision is consistent with the purposes underlying § 524(g). The channeling injunction issued in the Johns-Manville bankruptcy, after which § 524(g) was modeled,
 
 see
 
 140 Cong. Rec. H10752, H10765 (1994) (in codifying the Manville "trust/injunction mechanism” in § 524(g), Congress set forth "explicit requirements simulating those met in the Manville case”), was limited to third-party actions against non-debtors in which the liability alleged was derivative of the debtor.
 
 See MacArthur Co.
 
 v.
 
 Johns-Manville,
 
 837 F.2d at 92-93 (2d Cir.1988) (explaining that the channeling injunction applied only to "third parties [who] seek to collect out of the proceeds of Manville's insurance policies on the basis of Manville’s conduct”).
 

 [48]
 

 . Outside the context of § 524(g), § 524(e) provides statutory authority for limiting the extension of bankruptcy relief to non-debtors.
 
 See
 
 11 U.S.C. § 524(e) ("[Discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.”).
 

 [49]
 

 . The well-settled maxim that specific statutory provisions prevail over more general provisions supports our conclusion that the explicit limitations and requirements set forth in § 524(g) preclude the use of § 105(a) to extend application of the trust/injunction mechanism to the non-derivative claims against non-debtors Basic and Lummus.
 
 See Varity Corp. v. Howe,
 
 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (interpreting the "the specific governs the general” canon of statutory construction as "a warning against applying a general provision when doing so would undermine limitations created by a more specific provision”);
 
 see also Sea Harvest Corp. v. Riviera Land Co.,
 
 868 F.2d 1077, 1080 (9th Cir.1989) (Section 105(a) "does not empower courts to issue orders that defeat rather than carry out the explicit provisions of the Bankruptcy Code[.]”);
 
 see generally
 
 2 Collier on Bankruptcy, ¶ 105.04 at 105-15 n.5;
 
 In re Am. Hardwoods, Inc.,
 
 885 F.2d 621, 625-26 (9th Cir.1989) ("[S]ection 105 does not authorize relief inconsistent with more specific law.”).
 

 [50]
 

 . The Plan proponents cite to several cases where § 105(a) injunctions in favor of non-debtors were approved, including
 
 In re Dow Corning Corp. (Dow Corning IV),
 
 280 F.3d 648, 656 (6th Cir.2002);
 
 In re Drexel Burnham Lambert Group, Inc.,
 
 960 F.2d 285, 292 (2d Cir.1992); and
 
 In re A.H. Robins Co.,
 
 880 F.2d 694, 700-02 (4th Cir.1989). But these cases are readily distinguishable, given that none involved either asbestos or § 524(g). Whatever may be the limits of § 105(a) in other contexts, we hold only that § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g), which is the means Congress prescribed for channeling the asbestos liability of a non-debtor.
 

 [51]
 

 . While it is clear that Lummus was solvent, there is a discrepancy in the record regarding Basic. The Bankruptcy Court made no explicit findings of fact on this point, but commented in a footnote that Basic appears to be insolvent.
 
 See In re Combustion Eng’g,
 
 295 B.R. at 484 n. 43. On the other hand, Basic's president testified that while Basic does not have ongoing operations, it does have assets and sufficient funds to pay its liabilities.
 

 [52]
 

 . Appellants also argued the pre-petition payments violate Delaware’s preference statute, 10 Del.Code § 7387. Neither the District Court nor the Bankruptcy Court made findings with respect to this claim. Therefore, we will remand on this issue.
 

 [53]
 

 . Ms. Zilly did not consider the approximately $400 million contributed by Combus.tion Engineering to the CE Settlement Trust in her Chapter 7 liquidation analysis because "it would be very difficult to get those monies back and .... any sort of, a preference action
 
 *241
 
 would not be sustainable and would take an extraordinary length of time and ultimately not recover value under a liquidation recovery.” Whether or not this is the case, Ms. Zilly's analysis is not the correct one for determining whether a transfer constitutes a voidable preference under § 547(b).
 

 [54]
 

 . Combustion Engineering's assets were between $800 million and $1 billion prior to the pre-petition settlement. With respect to Combustion Engineering's outstanding asbestos liability, the Certain Cancer Claimants' expert, Dr. Timothy Wyant, estimated it to be approximately $3.6 billion. The Plan proponents contest the methodology employed by Dr. Wyant in arriving at this figure, and the Bankruptcy Court did not credit his testimony. But neither the Bankruptcy Court nor the District Court adopted contrary findings. Assuming Dr. Wyant's estimate is correct, asbestos claimants would have recovered, at most, an average of 28% ($1 billion in assets divided by $3.6 billion in liability) of their claim value in a Chapter 7 liquidation.
 

 [55]
 

 .
 
 Clarke v. Rogers,
 
 228 U.S. 534, 548, 33 S.Ct. 587, 57 L.Ed. 953 (1913) (''Equality between creditors is necessarily the ultimate aim of the bankrupt[cy] law, and to obtain it we must regard the essential nature of transactions [.]”). Only after analyzing the totality of circumstances surrounding a reorganization plan can the court exercise the " 'informed, independent judgment’ which is an essential prerequisite for confirmation of a plan.”
 
 Am. United. Mut. Life Ins. Co. v. Avon Park,
 
 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91 (1940) (internal citations omitted). "Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few,
 
 *242
 
 or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need.”
 
 Id.
 

 [56]
 

 .The record establishes that the CE Settlement Trust was a necessary element of the overall reorganization Plan. The parties entering the pre-petition settlement expressly contemplated the subsequent reorganization; the settlement itself provided that participating counsel "recommend to each Participating Claimant the acceptance of a CE Plan of Reorganization”; and the "stub claims” represent a direct link between the pre-petition trust and the reorganization vote.
 

 [57]
 

 .
 
 See generally Ortiz,
 
 527 U.S. at 854-55, 119 S.Ct. 2295 (emphasizing that a limited-fund asbestos settlement must provide for "equity among members of the class” and "fairness of the distribution of the fund among class members”). Though
 
 Ortiz
 
 was decided under Fed. R.Civ.P. 23(b)(1)(B), the Court's requirement of fair treatment for all claimants — a principle at the core of equity — also applies in the context of this case.
 

 [58]
 

 . The Certain Cancer Claimants also argue the plan violates the supermajority voting requirement set forth in 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). Their arguments in this regard largely mirror the various challenges to Combustion Engineering's alleged manipulation of the voting process.
 

 [59]
 

 . A Chapter 11 plan of reorganization must satisfy all of the requirements of § 1129(a). They are: (1) the plan’s compliance with title 11, (2) the proponent’s compliance with title 11, (3) the good faith proposal of the plan, (4) the disclosure of payments, (5) the identification of management, (6) the regulatory approval of rate changes, if applicable, (7) the “best interest” test (i.e., each claim holder in an impaired class has accepted the plan or will receive no less than would be received in a Chapter 7 liquidation), (8) acceptance of the plan by each impaired class, (9) treatment of administrative and priority claims in accordance with § 1129(a)(9), (10) acceptance by at least one impaired class of claimants, (11) the feasibility of the plan (i.e., confirmation of the plan is not likely to be followed by liquidation or further reorganization except as contemplated in the plan), (12) the payment of bankruptcy fees, and (13) the payment of retiree benefits.
 

 [60]
 

 . Some courts have concluded there is nothing in the plain language of § 1129(a)(10) to prevent a debtor from “artificially” impairing claims.
 
 See, e.g., In re Greate Bay Hotel & Casino, Inc.,
 
 251 B.R. 213, 240 (Bankr.D.N.J.2000) ("Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims. If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satis-fled.”);
 
 In re Duval Manor Assocs.,
 
 191 B.R. 622, 628 (Bankr.E.D.Pa.1996) (concluding that "artificial impairment, while perhaps philosophically not the better view, is nevertheless clearly permitted under the plain meaning of the statute”);
 
 see also L & J Anaheim Assocs.,
 
 995 F.2d 940, 943 (9th Cir.1993) (holding that § 1124 does not differentiate between artificial and actual impairment of claims).
 

 [61]
 

 . See, e.g., Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.),
 
 7 F.3d 127, 132 (8th Cir.1993) ("[F]or purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debt- or’s exercise of discretion.”);
 
 Beal Bank, S.S.B. v. Waters Edge L.P.,
 
 248 B.R. 668, 690-91 (D.Mass.2000) (concluding 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired” for a proper business purpose);
 
 In re Daly,
 
 167 B.R. 734, 737 (Bankr.D.Mass.1994) ("A Debtor may not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying § 1129(a)(10)[.]”);
 
 In re Lettick Typografic, Inc.,
 
 103 B.R. 32, 39 (Bankr.D.Conn.1989) ("While the debtor may have achieved literal compliance with § 1129(a)(10), this engineered impairment so distorts the meaning and purpose of that subsection that to permit it would reduce (a)(10) to a nullity.”).
 

 [62]
 

 . There is evidence in the record that Combustion Engineering’s asbestos liability profile mirrors nationwide trends, and that a majority of Combustion Engineering claimants suffer from non-malignant injuries. But the record does not establish the precise breakdown, by disease category, of either Combustion Engineering claimants as a whole or CE Settlement Trust participants.
 

 [63]
 

 . The District Court concluded that non-participants in the CE Settlement Trust (such as the Certain Cancer Claimants) "simply were not similarly situated" to the settlement participants by virtue of the different status of their claims. But in determining whether asbestos claimants are "similarly situated” for bankruptcy classification purposes, the relevant inquiry does not turn solely on the time the outstanding personal injury claims were filed. The substance — or the "legal character” — of the claims is also relevant.
 
 In re AOV Indus. Inc.,
 
 792 F.2d 1140, 1150 (D.C.Cir.1986).
 

 [64]
 

 . Minimal due process requirements extend to bankruptcy proceedings.
 
 See Jones v. Chemetron Corp.,
 
 212 F.3d 199, 209 (3d Cir.2000);
 
 Fogel v. Zell,
 
 221 F.3d 955, 962 (7th Cir.2000).
 

 [65]
 

 .
 
 See generally
 
 Geoffrey C. Hazard Jr.,
 
 Symposium.
 
 —Mass
 
 Torts: The Futures Problem,
 
 148 U. Pa. L.Rev.1901 (2000).
 

 [66]
 

 . The Certain Cancer Claimants raise several additional (and related) challenges to the voting process concerning the two-trust structure. The Certain Cancer Claimants argue the stub claim votes are not allowable because the Master Settlement Agreement states that CE Settlement Trust participants "shall not seek to recover from [Combustion Engineering] ... any amount of the Settlement Amount or other make any claims against [Combustion Engineering] ... or seek to recover against [Combustion Engineering] ... except that nothing herein shall preclude filing a proof of claim in a [Combustion Engineering] bankruptcy.” Because their claims are not enforceable against the estate outside of bankruptcy, the Certain Cancer Claimants argue, the stub claimants had no right to vote on Plan confirmation.
 

 The right to vote on plan confirmation belongs to holders of those claims "allowed under section 502.” 11 U.S.C. § 1126(a). Under § 502(b)(1), however, a claim will not be allowable if it "is unenforceable against the debtor, and property of the debtor under
 
 *246
 
 any agreement!.]” 11 U.S.C. § 502(b)(1). To determine whether claims are enforceable for bankruptcy purposes, § 502 relies upon applicable non-bankruptcy law.
 
 See
 
 4
 
 Collier on Bankruptcy
 
 ¶ 502.03[2][b][ii] (15th rev. ed. 2003) ("The validity and legality of claims is generally determined by applicable non-bankruptcy law.”). A claim against the bankruptcy estate, therefore, "will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.”
 
 United States v. Sanford,
 
 979 F.2d 1511, 1513 (11th Cir.1992). Ultimately, the effect of § 502 is to provide a bankruptcy trustee with the same rights and defenses to claims as held by the debtor prior to bankruptcy.
 
 See
 
 Collier ¶ 502.03[2][b][I];
 
 see also
 
 11 U.S.C. § 558 (making defenses available to debtor available to the estate).
 

 The Master Settlement Agreement accomplishes this by affirming the validity of the stub claims in bankruptcy.
 
 See
 
 Master Settlement Agreement § 5.02 ("Each Qualified Claimant agrees ... CE is liable for payment on the Settlement Amount”). The Master Settlement Agreement provision mandating that CE Settlement Trust participants enforce their stub claims in the bankruptcy proceedings merely requires that the terms of the agreement be recognized in bankruptcy. This does not violate § 502.
 

 The Certain Cancer Claimants also argue that requiring a power of attorney to accompany each ballot violates the Federal Bankruptcy Rules of Procedure. Fed. R. Bankr.P. 9010(c) provides "[t]he authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose other than the execution and filing of a proof of claim or the acceptance or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the appropriate Official Form.” While Rule 9010(c) does not mandate a power of attorney to accompany every ballot, neither does it prohibit a debtor from requiring one. Here, the entire solicitation and voting process was conducted through a small group of law firms who collectively represented hundreds of thousands of individual claimants. Where the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid.
 

 [67]
 

 . There are numerous "good faith” requirements associated with the bankruptcy reorganization process. In addition to § 1129(a)(3), a court may "designate" (i.e., disqualify from voting) the ballot of "any entity whose acceptance or rejection” of the plan "was not in good faith, or was not solicited or procured in good faith.” 11 U.S.C § 1126(e);
 
 see also Figter Ltd. v. Teachers Ins. & Annuity Ass’n of Am. (In re Figter Ltd.),
 
 118 F.3d 635, 638 (9th Cir.1997). We have also recognized good faith as a threshold requirement for filing a Chapter 11 bankruptcy petition.
 
 See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),
 
 384 F.3d 108, 112 (3d Cir.2004) ■ (holding bankruptcy petition was not filed in good faith);
 
 In re SGL Carbon Corp.,
 
 200 F.3d 154, 167 n. 19 (3d Cir.1999) ("Although it is true the proposed plan would be subject to a separate 'good faith' determination by the bankruptcy court before it could implemented,
 
 see
 
 11 U.S.C. § 1129(a)(3), that is only appropriate if the bankruptcy petition properly belongs before the bankruptcy court. In a case, such as this one, where a debtor attempts to abuse the bankruptcy process, proceedings should end well before formal consideration of the plan.”). We focus here on the statutory good faith requirements. The District Court's determinations of fact on good faith are reviewed for clear error,
 
 In re PWS Holding Corp.,
 
 228 F.3d at 242, while conclusions of law are subject to plenary review.
 
 In re Gioioso,
 
 979 F.2d 956, 959 (3d Cir.1992).
 

 [68]
 

 . The Certain Cancer Claimants also contend the pre-petition payments to the CE Settlement Trust participants and creation of the stub claims violate the good faith requirement of § 1126(e) because they amount to payments in exchange for votes in favor of the plan. As noted
 
 (see supra
 
 note 67), under § 1126(e), a bankruptcy court may designate the vote of any entity “whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions” of the Bankruptcy Code. 11 U.S.C. § 1126(e);
 
 see also Century Glove, Inc. v. First Am. Bank,
 
 860 F.2d 94, 97 (3d Cir.1988) (Section 1126(e) “grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.' ").
 

 Section 1126(e) is often used to monitor the conduct of creditors who seek to gain an untoward advantage over others in the bankruptcy process. In interpreting the predecessor provision to § 1126(e), § 203 of the Bankruptcy Act, the Supreme Court noted:
 

 Its purpose was to prevent creditors from participating who 'by the use of obstructive tactics and hold-up techniques exact for themselves undue advantages from the other stockholders who are cooperating.' Bad faith was to be attributed to claimants who opposed a plan for a time until they were ‘bought off'; those who 'refused to vote in favor of a plan unless .... given some particular preferential advantage.'
 

 Young v. Higbee Co.,
 
 324 U.S. 204, 211 n. 10, 65 S.Ct. 594, 89 L.Ed. 890 (1945) (citing Revision of the Bankruptcy Act: Hearings Before the Committee on the Judiciary of the House of Representatives, 75th Cong., 1st Sess. on H.R. 6439, Serial 9, at 180-82). The Court concluded § 203 was meant to apply to creditors "whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets.”
 
 Id.
 
 at
 
 *248
 
 211, 65 S.Ct. 594.
 
 See also In re Figter Ltd.,
 
 118 F.3d at 639 ("If a person seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith. But that does not mean that creditors are expected to approach reorganization plan votes with a high degree of altruism[.]”) (internal citation omitted).
 

 This issue is also remanded for further consideration.
 

 [69]
 

 .
 
 See
 
 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.”)
 

 [70]
 

 . But there are additional factors here. One is the significant financial contributions to the Asbestos PI Trust by non-debtors ABB Limited, Basic and Lummus. From the claimants’ perspective, it may make little economic difference whether the source of future funds comes from the debtor or a third-party, so long as a sufficient and reliable pool of assets remains available to pay their claims.
 

 Counterposed against this is the fact that the Asbestos PI Trust is a closed fund, raising a possible concern should it hold insufficient funds to pay all allowed claims against it.